648 A.2d 608

**PHYSICIANS INSURANCE COMPANY, Petitioner,**

**v.**

**Thomas P. CALLAHAN, as Director of the Medical Professional Liability Catastrophe Loss Fund**

**and**

**The Medical Professional Liability Catastrophe Loss Fund, Respondents.**

Commonwealth Court of Pennsylvania.

Heard June 28 and July 7, 1994.

Decided Sept. 16, 1994.

Publication Ordered Sept. 29, 1994.

486

Lawrence G. McMichael, for petitioner.

M. Kelly Tillery and Thomas P. Callahan, for respondents.

RODGERS, Senior Judge.

Physicians Insurance Company (Company) has filed its petition for review in the nature of a complaint in equity and declaratory judgment. On December 6, 1993, the Medical Professional Liability Catastrophe Loss Fund (the CAT Fund or Fund) and its director, Thomas P. Callahan, respondents, published Bulletin 64, requiring all primary coverage medical malpractice insurers, including the petitioner, (1) to make prompt tender at least forty-five (45) days prior to the scheduled date of trial of its full primary coverage limits of $200,000 to the Cat Fund, the excess carrier; (2) to evaluate the claim within one hundred twenty (120) days of the filing of a claim or notice to the primary insurer, and to notify the Cat Fund within thirty (30) days thereafter if it is determined that the value of the claim may reasonably exceed the primary insurance; (3) to make a documented good faith effort to obtain the consent of the insured health care provider within ninety (90) days after giving notice to the Cat Fund of possible excess liability. Failure either to report a claim or to tender to the Cat Fund as required by Bulletin 64 may result, inter alia, in denial of Fund coverage of $1,000,000 or an action for bad faith claim handling against the primary insurer.[1]

The Company asserts that Bulletin 64 is in fact a binding regulation published by the Cat Fund in violation of the procedural requirements of the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602, 45 Pa.C.S. Ch. 5, 7 and 9 and the Regulatory

---

1. Bulletin 64 is attached as Appendix "A" to this opinion.

Review Act, Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1–745.15, that the Fund is not authorized to make such a regulation and that the regulation is unreasonable.

The Cat Fund argues that Bulletin 64 is not a regulation, but merely a statement of policy not subject to the Commonwealth Documents Law or the Regulatory Review Act, that the Fund has express and implied authority to publish such a policy statement, and that Bulletin 64's requirements are not unreasonable.

The Company asks the Court to declare Bulletin 64 null and void and to enjoin its enforcement, claiming irreparable damage. The Cat Fund argues that Bulletin 64 is valid, that the Company has not shown any damage and that it has adequate administrative and judicial remedies.

This Court held hearings on June 28 and July 7, 1994. The Company called Thomas P. Callahan, Director of the Cat Fund, as on cross examination, Marilyn Rodgers, Claims Manager and President of Professional Adjustment Services, a claims adjusting affiliate of the petitioner, Physicians Insurance Company and David Galloway, general counsel for the Company.

The Cat Fund called Harriet F. Withstandley, assistant counsel of the Cat Fund, and Carole Z. Strickland, a claims supervisor of the Fund. After consideration of the testimony and arguments of counsel, the Court makes the following findings of fact and conclusions of law.

The Company is a basic or primary coverage insurer pursuant to the Health Care Services Malpractice Act (the "Act"), Act of October 15, 1975, P.L. 390, *as amended*, 40 Pa.S. §§ 1301.101–1301.1006, doing business in the Commonwealth. The Cat Fund is an excess insurer and an executive agency of the Commonwealth established by the Act. The Act was passed in October, 1975 and amended in July, 1976, in response to a crisis in the medical profession precipitated by the withdrawal from the market of companies writing medical malpractice insurance.

The Act creates a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider as a consequence of any claim for professional liability brought against such health care provider to the extent such health care provider's share of the judgment or settlement exceeds the basic coverage insurance. The basic coverage insurer provides the first $200,000 in coverage and the Cat Fund provides excess insurance coverage of $1,000,000 per occurrence. An annual surcharge is levied on all health care providers covered by the Act and paid to the Fund for the excess insurance coverage.

The Cat Fund is administered by a director appointed by the Governor. Pursuant to the Act, the director "may promulgate rules and regulations relating to procedures for the reporting of claims to the fund." 40 P.S. § 1301.702(a). The basic coverage insurance carrier

shall promptly notify the director of any case where it reasonably believes that the value of the claim exceeds the basic insurer's coverage.... Failure to so notify the director shall make the basic coverage insurance carrier ... responsible for the payment of the entire award or verdict, provided that the fund has been prejudiced by the failure of notice.

40 P.S. § 1301.702(c).

The basic coverage insurance carrier is responsible to provide a defense to the claim, including defense of the Fund, but where the director has been notified that the value of the claim exceeds the basic coverage, the director may join in the defense and be represented by counsel. 40 P.S. § 1301.702(d).

The director is authorized to defend, litigate, settle or compromise any claim payable by the Cat Fund, but the basic insurance coverage carrier shall have the right to approve any settlement entered into by the director on behalf of its insured. 40 P.S. § 1301.702(f).

Bulletin 64 was published by the Cat Fund on December 6, 1993. It requires prompt notice to the Cat Fund of claims which may exceed available primary coverage and requires

prompt tender of primary coverage limits to the Fund. Tender means a written commitment by a primary insurer to surrender the full limits of a primary policy of professional liability insurance to the Fund in an effort to resolve an outstanding claim. Late tender is defined "as tender less than forty-five (45) days prior to the scheduled date of trial". *See* Bulletin 64.

Bulletin 64 also mandates that the primary carrier evaluate the claim within 120 days of the filing of a claim or notice to the primary carrier, whichever is later, notify the Cat Fund within thirty days thereafter if it is determined that the value of the claim may reasonably exceed the primary insurance by filing a C–416 form, and submit a request to the insured health care provider defendant of a consent to settle form within ninety days of filing the C–416. Failure to either report a claim as provided in Bulletin 64 or to tender in a timely manner may result in the Cat Fund denying coverage to the insured health provider.

Prior to the publishing of Bulletin 64, the Cat Fund made no attempt to comply with the procedural requirements of the Commonwealth Documents Law or the Regulatory Review Act because it claimed to be publishing a statement of policy rather than a regulation. These acts require, inter alia, with respect to a proposed regulation, the soliciting of comments from primary insurers or health care providers, a publication in the Pennsylvania Bulletin for comment and review, submission of Bulletin 64 to the Independent Regulatory Review Commission and designated standing committees of each house of the General Assembly prior to the issuing of Bulletin 64. These acts also require the submission of a proposed regulation to the Attorney General to review its proposed form and legality before it may become effective as a regulation.

The Fund has no procedure to conduct "adjudications" before invoking the sanctions in Bulletin 64 but, upon request, may, informally, reconsider and, perhaps, revoke or modify such sanctions at the discretion of the Fund.

By letter dated March 2, 1994, Mr. Callahan, Director of the Cat Fund, notified Marilyn Rodgers, Claims Manager of the Company, that the Cat Fund was denying insurance coverage in the case of *Washington v. Giuffre, M.D.*, because the Company had failed to give timely notice or to make timely tender as required by Bulletin 64.

By letter dated March 3, 1994, Ms. Rodgers notified the Chief Counsel of the Cat Fund that the Company had given prompt notice and made prompt tender and, subsequently, the Fund revoked its denial of insurance coverage in this matter. However, the Fund takes the position that the sanction of revoking its coverage of $1,000,000 and requiring the primary carrier to pay in excess of its policy limits of $200,000 for violation of Bulletin 64 is within the sole discretion of the director of the Fund. In addition to actually revoking coverage pursuant to Bulletin 64, the Cat Fund has threatened to revoke coverage in numerous cases, but has not carried out its threat. Bulletin 64 requires the primary carrier to tender to the Fund within forty-five days of the scheduled trial date or risk exposure to the entire settlement or judgment. This risk induces the primary carrier to tender its limits to the Cat Fund in situations where it would previously have waited or elected to try the case.

Tender requires the primary carrier to surrender to the Cat Fund its $200,000 policy limits so that the Cat Fund may utilize the primary's money to settle the case. Once a primary carrier tenders to the Cat Fund, its $200,000 policy limits are no longer within its control. Instead, a primary carrier's $200,000 is then under the control of the Cat Fund which is authorized to offer the primary carrier's money to settle the claim. Once the primary carrier tenders, the plaintiff soon becomes aware of that fact, and the likelihood of negotiating within the primary carrier's policy limits is substantially reduced. Bulletin 64 has had the effect of substantially increasing the number of tenders to the Fund, while the actual number of claims has remained relatively constant. The Company's normal success rate, that is, a defense verdict, is ninety to ninety-five per cent in cases that go to trial.

Since Bulletin 64 was implemented, the number of indemnity payments made on the Company's behalf has increased. The number of payments made by the Fund has similarly increased, but the Fund offered conflicting testimony on whether the Fund was settling each case for a lower amount.

Mr. Callahan, the director of the Fund, testified that, by reason of the Day Forward program of the Philadelphia Common Pleas Court, designed to clear up the backlog of civil cases awaiting trial, the number of claims settled by the Cat Fund has increased but, because the Fund was paying less for each case, it had already saved a substantial amount. However, Mr. Callahan denied that the savings were due to the Fund taking more tenders from the primary carrier and settling cases at the expense of the basic carrier, because the average Cat Fund payment in 1994 was still between $450,000 and $500,000. Ms. Withstandley, assistant counsel of the Cat Fund, testified that in 1993 the Fund had paid out about $165,000,000 in resolving 350 cases, which averages out to about $470,000 per case, the same average put forth by Mr. Callahan in 1994.

Mr. Callahan attributed the reported savings in 1994 to the effect of Bulletin 64, but Ms. Withstandley was unable to say whether Bulletin 64 had resulted in any savings because of the complications introduced by the Day Forward program in the Common Pleas Court of Philadelphia. She did agree that the Company was making more tenders and earlier tenders because of Bulletin 64, but said that was not true of other primary carriers.

The Cat Fund claimed that Bulletin 64 was issued in response to the failure of some primary carriers, including the Company, to properly prepare cases for trial by not conducting appropriate discovery nor engaging medical experts, causing the Fund to make excessive payments to settle poorly prepared cases.

However, on behalf of the Company, Ms. Rodgers testified that eighty percent of the claims made for medical malpractice are dismissed without any payment and, that of the remaining

twenty percent, all but four percent settle within the limits of the basic policy.

Of the cases that actually go to trial, ninety to ninety-five percent result in a defense verdict. These figures were not disputed by the Cat Fund, and do not show poor preparation by the basic insurers.

This Court finds that poor preparation for trial on the part of the basic carriers was not a significant factor in the amount of payments being made by the Cat Fund.

■ In any event, the Cat Fund as an excess carrier may seek reimbursement of any indemnity monies expended by reason of the bad faith actions of the primary insurer. *U.S. Fire Insurance Co. v. Royal Insurance Co.,* 759 F.2d 306 (3d Cir.1985). *See Judge v. Allentown and Sacred Heart Hospital Center,* 506 Pa. 636, 487 A.2d 817 (1985).

The Court also finds that, by reason of the concerted efforts by the Court of Common Pleas of Philadelphia and other counties to clear their backlog of tort cases, more malpractice claims are being presented to the Cat Fund, which ended 1993 with a surplus of under $1,000,000. The Fund has the right under the Act to levy an emergency surcharge on health care providers, but has never made such a levy. In addition, the Cat Fund operates with a relatively small staff, consisting of six claims examiners, two supervisors, a claims manager and two attorneys, as well as the director and deputy director. Rather than engage additional personnel to handle the increased number of claims, the Cat Fund published Bulletin 64 in the hope it might help to even out its workload.

The issues to be decided in this case are (1) whether Bulletin 64 is merely a statement of policy or a binding regulation; (2) whether the Fund is authorized to make such a regulation, and; (3) whether such a regulation is unreasonable and arbitrary.

■ On the first issue, in the case of *Department of Environmental Resources v. Rushton Mining Co.,* 139 Pa.Commonwealth Ct. 648, 591 A.2d 1168, *petition for allowance of*

*appeal denied,* 529 Pa. 626, 600 A.2d 541 (1991), this Court said:

In *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671 (1977), our Supreme Court concluded that the General Assembly did not intend for the agency to have sole discretion in determining when a statement of policy would be settled enough to become a regulation.

To preclude an agency from avoiding notice and comment, our Supreme Court in Norristown adopted the federal rationale, commonly known as the 'binding norm test,' to determine when a statement of policy is a regulation under the APA. Relying specifically on the reasoning of the Court of Appeals in the District of Columbia in *Pacific Gas & Electric Co. v. FPC,* 164 U.S.App.D.C. 371, 506 F.2d 33 (D.C.Cir.1974), our Supreme Court stated:

[A]n agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent, but is *merely an announcement* to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. *A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.*

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings ... A properly adopted substantive rule establishes a standard of conduct *which has the force of law* ... The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, *does not establish a "binding norm"* ... A policy statement announces the agency's *tentative intentions for the future.*

When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. (Emphasis added.)

'Binding norm' means that the agency is bound by the statement until the agency repeals it, and if the statement is binding on the agency, it is a regulation. Additionally, in determining whether an agency action is a regulation or a statement of policy, one must look to the extent to which the challenged pronouncement leaves the agency free to exercise discretion to follow or not follow the announced policy in an individual case.

*Id.*, 139 Pa.Commonwealth Ct. at 656–58, 591 A.2d at 1173 (footnotes omitted).

In October 1976, the Cat Fund adopted the following regulation:

The insurer or self-insurer shall, within 30 days of determining that a claim is likely to exceed the basic coverage of the insurer, or the retained limits of the self-insured, submit Form C–416 to the Director.

31 Pa.Code § 242.11.

Bulletin 64 provides in part that the primary carrier shall within 30 days notify the Fund by filing Form C–416 as specified in the above cited regulation.

That regulation does not include any sanction but the Act itself provides that failure to notify the Director shall make the basic coverage insurance carrier responsible for the payment of the entire award or verdict. Bulletin 64 not only requires the primary carrier to give the specified notice, but also provides that failure to report a claim in a timely manner may result in denial of Fund coverage, without the provision that the Fund has been prejudiced by the failure of notice. The language of the regulation and the language of Bulletin 64 concerning prompt notice is, in many respect, identical. Ms. Withstandley, the main author of Bulletin 64, frankly admitted that one of the reasons Bulletin 64 was not promulgated as a regulation was because of the time delay required in order to

comply with the Commonwealth Documents Law and Regulatory Review Act.

But the Cat Fund argues Bulletin 64 provides that the Fund *may* result in denial of fund coverage and, therefore, Bulletin 64 is not binding on the agency and does not qualify as a regulation.

But, even under the Act, the prompt notice requirement is not enforceable unless the Fund has been prejudiced by the failure of notice, yet it is not contended that this provision of the Act, or the regulation, transforms the law and the regulation into mere statements of policy, because the Cat Fund must exercise discretion in deciding whether it has been prejudiced.

■ Simply because a governmental agency has discretion whether or not to enforce a law or regulation does not transform the law or regulation into a mere statement of policy. Kenneth Davis points out in his Administrative Law Text (3d Ed.1972), p. 110, that prosecutors in both the criminal and civil law have wide discretion to decide whether to enforce or not to enforce laws and regulations.

Many Commonwealth regulations permit the executive agency the discretion of whether or not to impose sanctions on the affected party for failure to comply with mandatory requirements. *See* 22 Pa.Code §§ 73.181, 73.182 and 73.189 (providing that the State Board of Private Licensed Schools *may take* certain actions, in the nature of sanctions, for failure to comply with its policies, rules and regulations); 6 Pa.Code § 20.45 (permitting the area agency on aging the discretion to suspend or terminate services to a caregiver and/or to recover twice the amount of the reimbursement determined to be appropriate, plus interest); 16 Pa.Code § 49.17 (providing that the Pennsylvania Human Relations Commission *may* apply certain sanctions, after hearing and an adjudication, as appropriate to attain full and effective enforcement of its rules and regulations regarding equal employment opportunity and contracts with the Commonwealth). The language of Bulletin 64 should be contrasted with the language of Bulletin 32, dated

October 28, 1982, establishing claim reporting guidelines as a statement of policy. Bulletin 32 provides that failure to complete the C–416 form "will result in the Fund returning the form to the primary carrier with a request to fill in any section which is incomplete." Bulletin 32 concludes:

The new claim reporting guidelines were prepared in an effort to seek voluntary cooperation from all of the carriers in helping the fund during a time of expanding numbers of claims. Hopefully, we will have full compliance which will obviate the need to issue formal regulations on this subject. Your anticipated cooperation is greatly appreciated.

The Director of the Cat Fund admitted that the Fund did not contemplate the issuance of additional regulations to implement Bulletin 64 and that he did not intend to establish an adjudicatory process for handling individual cases. This Court concludes that Bulletin 64 is a purported regulation adopted in violation of the procedural requirements of the Commonwealth Documents Law and Regulatory Review Act and is, therefore, invalid and unenforceable.

Even if Bulletin 64 had been properly promulgated, this Court holds that the Fund was without authority to issue such regulation pursuant to the Health Care Services Malpractice Act. The relationship between the primary and excess carrier is set forth in the case of *Puritan Insurance Co. v. Canadian Universal Insurance Co., Ltd.*, 775 F.2d 76, 78–79 (3d Cir.1985):

The relationship between the primary and excess carrier is an unusual one; each has a separate contract with the insured, but they have none with each other. Conflicts of interest invariably arise when the underlying tort injury is of such severity that a recovery over the limits of the primary policy is possible. In that circumstance, the excess carrier wishes the primary insurer to dispose of the case within its limits and is not unduly impressed with the primary insurer's desire to save some or all of its policy limits by a favorable verdict at trial. Conversely, the primary carrier is unlikely to have such paternalistic feel-

ings as will induce it to concede its limits when there is some chance of obtaining a favorable verdict. In each instance, one carrier is to some extent gambling with the other's money. See generally, Lanzone and Ringel, Duties of a Primary Insurer to an Excess Insurer, 61 Neb.L.Rev. 259 (1982).

The obligations of the carriers to the insured are somewhat different. Because it has a duty to defend the insured and on average most claims are within its limits, the primary carrier charges a larger premium for an equivalent amount of coverage. In addition, the primary's policy generally gives it the right to decide when a claim shall be settled or tried.

Because of its less frequent exposure, the excess carrier generally charges lower premiums. Its obligation does not arise until primary limits are exhausted, and to some extent the excess carrier is at a disadvantage in dealing with a tight-fisted and overly optimistic primary carrier, which has greater control over settlement. To gain increased leverage, excess insurers frequently resort to use of the 'bad faith letter'—an epistle sent to the primary carrier demanding settlement within primary limits and warning that failure to do so will be interpreted as evidence of bad faith.

The insurance industry has long recognized the unsatisfactory nature of the relationship between primary and excess carriers.

The adversary relationship that at times exists between the Cat Fund and other medical malpractice insurers is recognized in the case of *Ohio Casualty Group of Insurance Companies v. Argonaut Insurance Co.,* 514 Pa. 430, 525 A.2d 1195 (1987), where an insurer who had paid a claim allegedly owed by the Fund brought an original action for recovery, but the Cat Fund claimed it had the right to initially adjudicate such a claim. The court held that the Cat Fund was not in the position to fairly assess its own liability. "No man shall be a judge in his own cause". *Bonham's Case,* 8 Co. 114a, 118a, 77 Eng.Rep. 646, 652 (1610). The Cat Fund claims it may unilaterally deny its $1,000,000 excess coverage if the primary

carrier fails to release its $200,000 basic coverage to the Cat Fund at least forty-five days before the scheduled date of trial. It also asserts the right to revoke its excess coverage in the event that the primary carrier failed to make a written request to the insured doctor that he consent to settlement of the claim. The only right specifically given to the Cat Fund to promulgate rules and regulations says that it "may promulgate rules and regulations relating to procedures for the reporting of claims to the fund." 40 P.S. § 1301.702(a). The Act does not refer to regulations relating to tender of the amount of the basic policy to the Cat Fund or requiring the basic carrier to attempt in writing to secure the consent of the insured. The Fund claims it has these rights, nevertheless, because the Act gives it the authority to "defend, litigate, settle or compromise any claim payable by the fund." 40 P.S. § 1301.702(f). In the case of *Chambers Development Co., Inc. v. Department of Environmental Resources,* 118 Pa.Commonwealth Ct. 97, 104–05, 545 A.2d 404, 407–08 (1988) (quoting *Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 76–78, 313 A.2d 156–169 (1973)), the court said:

There is a well-recognized distinction in the law of administrative agencies between the authority of a rule adopted by the agency pursuant to what is denominated by the textwriters as *legislative* rule-making power and the authority of a rule adopted pursuant to *interpretative* rule-making power. The former type of rule 'is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the Legislative body', and 'is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable.' K.C. Davis, 1 Administrative Law Treatise § 5.03, at 299 (1958). A court in reviewing such a regulation, 'is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action ... involved, it is not enough that the

prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be "so entirely at odds with fundamental principles ... as to be the expression of a whim rather than an exercise of judgment...." '

An interpretive rule on the other hand depends for its validity not upon a *law*-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation. (Emphasis in original.)

The tender provision effectively transfers control of settlement of the case from the basic carrier to the Fund. Such provision is in conflict with the provision of the Act which grants to the basic carrier the right to approve any settlement entered into by the Director on behalf of its insured doctor. Therefore, such provision is not valid.

■ Furthermore, the Company's policy contains a valid provision that "the Company shall not compromise any claim hereunder without the written consent of the insured unless the insured is not reasonably available to the Company for the purpose of obtaining consent." *See* Company's Occurrence Policy, Form OCC–1. The provision of Bulletin 64 requiring a company to make a written request of the doctor to consent to settlement, even though the basic carrier believes the claim defensible and the doctor has made an intelligent decision not to consent, is also invalid.

■ Bulletin 64 also permits the Fund to unilaterally decide whether its coverage is available to the health care provider in clear violation of the principle that "no man shall be a judge of his own cause". *Bonham's Case.*

■ The Fund does have the right under the Act to promulgate regulations regarding the procedures for the reporting of claims to the Fund and, in this respect, Bulletin 64 is not objectionable except to the extent that it does not include the provision that liability of the basic coverage insurance carrier in the event of untimely notice of the claim is conditioned upon prejudice to the Fund by the failure of notice.

Ms. Withstandley, the assistant counsel for the Fund, explained that despite the literal language of Bulletin 64, in practice the Fund will not revoke insurance coverage if it has not been prejudiced, nor will it require tender if the carrier in good faith has determined that the claim is defensible, nor will it require the basic carrier to try to secure the consent of the doctor where the basic carrier has determined the claim is defensible in good faith and the doctor has refused to give his consent.

Such qualifications are not present in the language of Bulletin 64. The language is peremptory and its enforcement should not depend upon informal interpretation of its current counsel.

■ The Company also attacks Bulletin 64 on the grounds that its provisions, particularly in regard to making tender of the Company's basic policy at least forty-five days before the scheduled date of trial, are arbitrary and unreasonable because of varying conditions in various courts of the Commonwealth.

The Cat Fund's reply is that, in particular situations where it is not possible to intelligently make such tender, the Cat Fund will not insist upon enforcement. But, in fact, the Cat Fund has on at least one occasion notified the Company that the Fund was revoking its excess coverage and has also claimed that the Company has been in "technical violation" of Bulletin 64 on at least five other occasions, which to date have not resulted in sanctions.

In sum, this Court finds that Bulletin 64 is a regulation promulgated in violation of the Commonwealth Documents Law and Regulatory Review Act and, therefore, is invalid;

that the Fund has no authority under the Health Care Services Malpractice Act to uniformly require the basic coverage insurance carrier to tender the proceeds of its policy to the Cat Fund at least forty-five days before the scheduled date of trial; that the Fund has no authority to require the Company to make a written request of its insured to consent to settlement of a claim; and that the Fund has no authority to unilaterally determine to terminate its insurance coverage because of the alleged failure of the Company and other basic carriers to comply with the provisions of Bulletin 64.

The Cat Fund also argues that injunctive relief does not lie in this case because the Company has suffered no irreparable damage and has an adequate remedy at law. However, any administrative remedy afforded by the Cat Fund places it in a position where it is assessing its own liability in violation of the *Argonaut* case. The Company and other basic coverage insurance carriers are presented with a choice between incurring the business disadvantage of complying with the provisions of Bulletin 64, which has already resulted in a substantial increase in the number of indemnity claims which the Company has paid, or taking the risk of a civil penalty, where it may be required to pay an additional $1,000,000 dollars for an occurrence, even though the Act provides "[n]o insurer providing professional liability insurance shall be liable for payment of any claim against a health care provider for any loss or damages awarded in a professional liability action in excess of the basic coverage insurance." 40 P.S. § 1301.701(b). The Court concludes that Bulletin 64 is causing irreparable damage to the Company and that the Company has no adequate remedy at law.

The Cat Fund also argues that it will suffer greater injury if Bulletin 64 is enjoined, because, according to Ms. Withstandley, in the next six months it will resolve a total of about 175 cases, and without the sanctions of Bulletin 64, the Cat Fund will be required to make payment in ten percent of those cases, the average settlement being about a half million dollars. She, therefore, estimates that the Fund may suffer damages of about $9,000,000. Counsel for the Fund incorrect-

ly interprets Ms. Withstandley's testimony to mean that the Cat Fund will resolve a total of 175 cases in the next six months, that the Company alone accounts for ten percent, or eighteen of those cases, that $9,000,000 may be paid out by the Fund for the settlement of the Company's cases alone, and that, therefore, the damages for the entire 175 cases which the Cat Fund will resolve in the next six months at $500,000 per case is 87.5 million dollars. This interpretation assumes that, by reason of Bulletin 64, the Cat Fund will not be required to make any payments at all during the next six months. This Court finds Ms. Withstandley's testimony not to be credible, and the interpretation of counsel for the Cat Fund has no basis in the evidence.[2]

Accordingly, this Court will grant the relief requested by the petitioner, Physicians Insurance Company.

## ORDER

NOW, September 16, 1994, this Court declares that Bulletin No. 64 published by the respondents, Thomas P. Callahan, as Director of the Medical Professional Liability Catastrophe Loss Fund, and the Medical Professional Liability Catastrophe Loss Fund, is null and void because it is a regulation that was published without compliance with the provisions of the Commonwealth Documents Law and Regulatory Review Act; that the respondents, Callahan and the Cat Fund have exceeded the authority granted by the Health Care Services Malpractice Act, in attempting to require all primary coverage medical malpractice carriers to make prompt tender at least forty-five days prior to the scheduled date of trial of their full primary coverage limits of $200,000 to the Cat Fund; in attempting to require all primary coverage medical malpractice carriers to make a documented good faith effort to obtain the consent of the insured health care providers within ninety days after giving notice to the Cat Fund of possible excess liability; and in purporting to determine unilaterally the Fund's right to deny coverage to the health care provider and to place such obligation on the primary medical malpractice

2. Ms. Withstandley testified that in 1993 the Cat Fund resolved a total of about 350 cases, at a cost of $165,000,000.

insurer. The respondents, Thomas P. Callahan, as Director of the Medical Professional Liability Catastrophe Loss Fund, and the Medical Professional Liability Catastrophe Loss Fund, are hereby enjoined from taking any action to implement Bulletin 64.

The petitioner, Physicians Insurance Company, shall file its bond in the amount of $5,000 with security approved by this Court, naming the Commonwealth as obligee, conditioned that if the injunction is dissolved because improperly granted or for failure to hold a hearing, the petitioner shall pay to any person injured all damages sustained by reason of granting the injunction and all legally taxable costs and fines, or the petitioner shall deposit with the Prothonotary of this Court legal tender of United States in an amount of $5,000 to be held by the Prothonotary upon the same condition as provided for the injunction bond.

Reporters' costs, initially, shall be paid equally by the petitioner and the respondent, Cat Fund.

## APPENDIX A

### Exhibit P–3

## COMMONWEALTH OF PENNSYLVANIA

## MEDICAL PROFESSIONAL LIABILITY

## CATASTROPHE LOSS FUND

Office of the Director
Suite 15–F
1062 Lancaster Avenue
Rosemont, PA 19010
215–560–5160

December 6, 1993

Bulletin # 64

Pursuant to the statutory authority contained in Act 111, Section 1301.702(a), 40 P.S. Section 1301.702(a), this Bulletin clarifies the Fund's requirements for prompt notice to the Fund of claims which may exceed available primary coverage. This Bulletin also establishes and defines the requirement of

prompt tender to the Fund of primary coverage limits in order for health care providers to participate in the Medical Professional Liability Catastrophe Loss Fund for resolution of medical malpractice claims. Any reference to "primary insurer" shall include self insured health care providers authorized to participate in the Fund pursuant to 31 Pa.Code Section 243.1, et seq. Tender shall mean written commitment by a primary insurer to surrender the full limits of a primary policy of professional liability insurance to the Fund in an effort to resolve an outstanding claim.

Within 120 days of the filing of a claim or notice to the primary insurer, whichever is later, the primary insurer shall evaluate the claim. If it is determined that the value of the claim may reasonably exceed primary or self insurance, the primary carrier shall, within 30 days, notify the Fund, by filing Form C–416, as specified in the Regulations, 31 Pa.Code Section 242.6(a)(4).

Simultaneous with the filing of Form C–416, the primary carrier shall provide those additional documents specified in the Fund's Claims Reporting Guidelines, attached hereto and incorporated herein by reference. Within 90 days of the filing of Form C–416, the primary carrier shall submit a request to the named health care provider defendant[s], seeking consent to resolve the claim, if consent is required by the terms of the primary policy. Under certain circumstances, health care provider defendants may reasonably be expected to refuse to consent to settle a claim. This Bulletin is not to be construed to mandate that health care provider defendants consent to settle all cases, but that failure to obtain consent shall not excuse a late tender by the primary carrier to the Fund except where a documented good faith effort has been made to obtain such consent.

Late tender by primary carriers deprives the Director of his express statutory authority " . . . to defend, litigate, settle or compromise any claim payable by the fund." Further, late tender thwarts the general legislative mandate and intent of Act 111. For purposes of this Bulletin and compliance with

508

both the letter and the spirit of Act 111, late tender shall be defined as tender less than forty-five (45) days prior to the scheduled date of trial.

Failure either to report a claim or to tender to the Fund in a timely manner may result in, but not be limited to, the following: denial of Fund coverage, notice by the Fund of its intent to pursue its subrogation rights, referral to other appropriate state or federal agencies for violation of any other applicable laws or regulations, or action for bad faith claim handling against the primary insurer.

/s/ Thomas P. Callahan
Thomas P. Callahan
Director

TPC/HFW