**LINDE ENTERPRISES, INC., Petitioner,**

v.

**PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 1996.
Decided April 15, 1997.

W. Boyd Hughes, Dunmore, for petitioner.

Marc A. Ross, Assistant Counsel, Harrisburg, for respondent.

Before DOYLE and SMITH, JJ., and RODGERS, Senior Judge.

SMITH, Judge.

In this case of first impression, Linde Enterprises, Inc. (Linde) petitions for review of an order of the Environmental Hearing Board (Board) that dismissed Linde's appeals from compliance orders and from an assessment of civil penalty issued by the Department of Environmental Protection (DEP) against Linde, in relation to its removal of fill material from a site owned by BGM Fastener Company (BGM). DEP's actions were based on alleged violations of provisions of the Noncoal Surface Mining Conservation and Reclamation Act (Noncoal SMCRA), Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§ 3301—3326. The questions Linde states are: (1) whether its activity at the BGM site was outside DEP's jurisdiction, being purely construction site preparation regulated by 25 Pa.Code Chapter 102; (2) whether the activity, if classified as surface mining of minerals, was shown to be within the construction exemption; (3) whether the civil fine of $27,500 was excessive under the circumstances; and (4) whether Linde waived its right to object to personal jurisdiction of DEP over it, where it raised the issue at the hearing and in its post-hearing brief.

I

Linde, a utility, heavy and road construction contractor, entered into a subcontract in 1993 for site preparation work on a project to build a K–Mart in Wayne County, across the road from a tract owned by BGM. The BGM site was a hill; BGM initially considered erecting a building there for its own use. In June 1993 representatives of Wal–Mart Stores, Inc. (Wal–Mart) approached Philip Goyette of BGM about the possibility of acquiring the land at issue here, as well as some land behind it, for construction of a Wal–Mart store. BGM decided to pursue that or similar purchases as a more lucrative use of its land. Linde and BGM entered into a Site Improvement Agreement dated July 30, 1993, providing for Linde to remove 50,-000 cubic yards of fill that it needed for the K–Mart project and for Linde to leave BGM with a "viable building site" and an earth access road. BGM did not charge for the fill and Linde did not charge to remove it. Linde could have obtained suitable fill without charge from three other sources in the area.

In July 1993 a DEP inspector supervisor advised Linde's president Eric Linde to obtain a surface mining permit unless the activity came within the building construction exemption, as explained in DEP's Program Guidance Manual. Linde commenced its earth removal operations on August 23, 1993. A DEP inspector arrived that morning, observed the activity and then directed Eric Linde to cease. After examining documents provided by Eric Linde, the inspector informed Linde that the building construction exemption did not apply and issued a compliance order citing Linde for mining without a permit and directing it to cease. Linde informed DEP of its position that no permit was necessary. DEP issued a second compliance order directing Linde to cease on August 30, 1993, for failure to comply with the first order. Linde appealed the two compliance orders but did not seek a supersedeas. It continued its operations until November and removed some additional material in 1994. DEP inspectors in 1993 and 1994 never observed any indication that a building was soon to be erected.

On January 5, 1994, Wal–Mart entered into a purchase agreement with BGM for 15 acres of the BGM site, which provided for many contingencies, such as a determination after a 150–day feasibility period that the development was economical and viable. As of the last day of hearings, January 26, 1995, Wal–Mart had not yet purchased the land or set a closing date, and no building permit had been issued. Under the Wal–Mart plan the area excavated by Linde would be at the entrance to a larger area higher and farther back, where the building and parking lot would be. On February 25, 1994, DEP issued an assessment of civil penalty totaling $27,500, made up of an initial $5000 penalty and a penalty of $750 per day, which was capped at 30 days, although Linde still was not in compliance.

■ The Board concluded that Linde's activity at the BGM site "was a borrow operation, pure and simple," Board's Adjudication, p. 29, which constituted surface mining of minerals within the definitions in Section 3 of the Noncoal SMCRA, 52 P.S. § 3303. The Board explained that fill material brought on to a construction site from elsewhere is commonly known as "borrow," and the place from which the material is taken is known as the "borrow pit," regardless of whether it resembles a pit. Further, the Board concluded that the building construction exemption is not intended to apply to activities in conjunction with real estate speculation but rather to construction projects that have some actuality. Linde's activity was not conducted concurrently with either the proposed BGM or Wal–Mart construction so as to fall within the exemption. Finding the penalties assessed to be reasonable, the Board dismissed Linde's appeals.[1]

## II

The definitions at issue from Section 3 of the Noncoal SMCRA are as follows:

"**Minerals.**" Any aggregate or mass of mineral matter, whether or not coherent, that is extracted by surface mining. The term includes, but is not limited to, limestone and dolomite, sand and gravel, rock and stone, earth, fill, slag, iron ore, zinc ore, vermiculite and clay; but it does not include anthracite or bituminous coal or coal refuse, except as provided in section 4, or peat.

. . . .

"**Surface mining.**" The extraction of minerals from the earth, from waste or stockpiles or from pits or from banks by removing the strata or material that overlies or is above or between them or otherwise exposing and retrieving them from the surface, including, but not limited to, strip mining . . . . *The term does not include any of the following:*

. . . .

(2) The extraction of sand, gravel, rock, stone, earth or fill from borrow pits for highway construction purposes of the Pennsylvania Department of Transportation or the extraction of minerals pursuant to construction contracts with the department if the work is performed under a bond, contract and specifications that substantially provide for and require reclamation of the area affected in the manner provided by this act.

. . . .

(5) The extraction, handling, processing or storing of minerals from any building construction excavation on the site of the construction where the minerals removed are incidental to the building construction excavation, regardless of the commercial value of the minerals. (Emphasis added.)

The Court notes that the object of all statutory interpretation is to ascertain and give effect to the intent of the legislature. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). *Markle v. Workmen's Compensation Appeal Board (Caterpillar Tractor Co.)*, 541 Pa. 148, 661 A.2d 1355 (1995). Where the words of a

---

1. The scope of this Court's review of an order of the Board is to determine whether the necessary findings of fact are supported by substantial evidence in the record and whether there was an error of law or a constitutional violation. *Empire Coal Mining & Dev., Inc. v. Department of Environmental Resources*, 678 A.2d 1218 (Pa. Cmwlth.1996).

statute are not explicit, the intention may be ascertained by considering, among other things, the consequences of a particular interpretation. Section 1921(c)(6), 1 Pa.C.S. § 1921(c)(6). *Franklin County Nursing Home v. Department of Public Welfare,* 126 Pa.Cmwlth. 375, 559 A.2d 1002 (1989), *appeal denied,* 525 Pa. 649, 581 A.2d 575 (1990). Where the words are free from ambiguity, however, no need for such interpretation arises; the letter of a statute is not to be disregarded under the pretext of pursuing its spirit. Section 1921(b); 1 Pa.C.S. § 1921(b). *State Farm Mut. Auto. Ins. Co. v. Department of Insurance,* 143 Pa.Cmwlth. 259, 598 A.2d 1344 (1991), *appeal denied,* 531 Pa. 659, 613 A.2d 563 (1992).

■ Linde first argues that its activities at the BGM site constituted construction site preparation, which is regulated by 25 Pa. Code Chapter 102, relating to erosion control, rather than the distinct activity of mining, which is subject to the jurisdiction of DEP's Bureau of Mining and Reclamation and requires a surface mining permit. Linde acknowledges the principle that an agency's interpretation through regulations of statutes that it enforces is entitled to great judicial deference, but it notes also that the meaning of a statute is essentially a question of law for the courts, and that, when an interpretive regulation is unwise or violative of legislative intent, the courts will disregard the regulation. *Physicians Ins. Co. v. Callahan,* 167 Pa.Cmwlth. 485, 648 A.2d 608 (1994).

Linde asserts that the purpose of the "earthmoving and excavation industry" is to alter the topography of land to bring it to an established grade by means of removing cut or adding fill, with no intent to retrieve a specific valuable mineral. Mining, by contrast, has as its object the extraction of some mineral, and the regulation of that activity requires returning the land as nearly as possible to its original contour, i.e., the opposite of the construction excavator's intent. Linde argues that the practical consequences of DEP's interpretation would be to require every construction contractor or owner who excavates a site to possess a mining license and to secure a mining permit before relocating any dirt off site. Linde interprets the legislature's use of the technical mining term "extraction" to indicate an intent for the statute to apply only to situations where a valuable mineral is uncovered and removed in the course of ordinary construction excavation.

Linde further argues that the purpose for which material is removed determines whether the activity is mining or construction activity. Section 3 of the Noncoal SMCRA defines "Active operation" as one where "a minimum of 500 tons of minerals for commercial purposes have been removed in the preceding calendar year." Section 5, 52 P.S. § 3305, relating to operator's license, in subsection (b) bases the fee for such license on whether the applicant is a person mining "2,000 tons or less of *marketable minerals* per year...." (Emphasis added.) These provisions demonstrate that the legislature was concerned only with sites where minerals are removed and sold. DEP never proved that the material Linde removed could be commercially processed, whereas Linde's witnesses showed that the material was just dirt with no commercial value and that Linde's intent was to relocate it, not to mine it.

The Court agrees with the Board and DEP that Linde's activity falls within the general definition of surface mining. As the Board and DEP have emphasized, the terms "earth" and "fill" are expressly included in the definition of "Minerals" in Section 3. The definition of "Surface mining" includes "[t]he extraction of minerals [i.e., earth and fill] ... [by] exposing and retrieving them from the surface...." The fifth enumerated exception excludes "[t]he extraction of [earth and fill] ... from any building construction excavation ... where the [earth and fill] removed are incidental to the building construction excavation" but not otherwise. Linde exposed material suitable for "fill," which it then retrieved and used for its own purposes elsewhere. The plain language of the statute inescapably defines Linde's activity as surface mining.

### III

■ Linde's second contention is that if its activity was surface mining, then it fell within

the building construction exemption. Linde states that the only purpose for exemption is to allow a contractor performing construction excavation who encounters a seam of coal or a minable mineral deposit to remove and sell it without the need for a surface mining permit. Linde notes that the definition of "Noncoal surface mining activities" in 25 Pa. Code § 77.1 adds the following to the building construction exemption's provision:

> For purposes of this section, the minerals removed are incidental if the excavator demonstrates that:
>
> > (A) Extraction, handling, processing or storing are conducted concurrently with construction.
> >
> > (B) The area mined is limited to the area necessary to construction.
> >
> > (C) The construction is reasonably related to the use proposed for the site.

DEP's Program Guidance Manual interprets "concurrent" as follows:

> Concurrent is defined as "running together; acting in conjunction; contemporaneous; or accompanying." The building construction activity should take place soon after the excavation which is necessary for the construction. On most building construction sites, the pouring of footers and construction of the foundation walls begins very soon after the excavation (usually within a month, unless delayed by weather).

Commonwealth's Ex. 10, p. 3.

Linde contends that the Board's interpretation of the building construction exemption is "myopic" and fails to take into consideration the reality of current real estate financing and development, where flexibility is required because the majority of large-scale construction projects involve evolution in stages or changes in purpose or intent. Nevertheless, even the Program Guidance Manual states that, if material has been removed and the project is not completed, DEP may consider the site to have been mined without a permit unless a satisfactory demonstration is made as to why the construction was not completed. According to Linde, BGM's plans began with the prospect of building its own building, but then they changed. BGM took steps including signing the January 1994 purchase agreement, removing timber from the area where the Wal–Mart building would be located and so on. Wal–Mart had a site plan prepared and paid an engineering firm between $100,000 and $200,000 for engineering work. These facts, Linde contends, show in retrospect that the work Linde performed was incidental to the Wal–Mart construction.

The Board adopted the reasoning of its denial of supersedeas in *F.A.W. Associates v. Department of Environmental Resources,* 1990 Envtl. Hearing Bd. 1791. In that case excavation for a proposed office park proceeded in accordance with the owner's ability to sell sand and gravel, with construction three or four years away. The Board concluded that more than mere intent to build was required. In response Linde asserts that it did not remove and sell a mineral for profit, that the excavation was not scheduled on the basis of such sales, that BGM did have a contract with Wal–Mart, and that the contours were set by BGM and Wal–Mart for construction of an access road. As for the Board's conclusion that Linde's activity was a borrow operation, Linde asserts that it did not solicit BGM for a source for fill; rather BGM approached Linde.

Again the Court agrees with the Board and DEP. Substantial evidence in the form of Goyette's testimony established that BGM no longer had any intent to construct a building of its own by July 1993. DEP warned Linde in July of the need to comply with the building construction exemption and provided the Program Guidance Manual as explanation. At that point Linde should have determined from BGM the status of the plans for a BGM building and should have approached DEP if it had any questions. DEP issued the first compliance order August 23, 1993, after learning that there was no building permit, that there were no scheduled starting or completion dates or blueprints and that the BGM building was just a proposal. At that point Linde was under a mandatory duty to cease operations or to demonstrate to DEP that the BGM building was to be built imminently.

Eric Linde testified that his response was to "file" the order and to direct his employees to continue working, based on his view that the activity was not mining and that, if it was, it fell within the building construction exemption. N.T. 1104. When questioned at the hearing on the existence of a construction schedule, Eric Linde stated:

I don't know that there was or was not a schedule. That would have been up to Mr. Goyette. I was not aware of any schedule at that time, other than the fact that he did say to me that it was now time to get things moving, he'd sat on the property long enough.

N.T. 1141–1142. As in *F.A.W. Associates,* Linde may not prevail by claiming that its excavation was "concurrent" with the construction of a building that might never be built.

■ The same rationale applies even more forcefully in regard to Wal–Mart. As late as January 1995 the property had not even been sold to Wal–Mart. Goyette testified that he needed to remove the hill at the entrance to BGM's property to make it more attractive to Wal–Mart or to other possible purchasers. N.T. 32. The Noncoal SMCRA in no sense prohibits such activity. As the Board noted in *F.A.W. Associates,* however, it is apparent that the building construction exception is based upon a recognition that the developer's primary goal is to earn a return through sale or lease of property, not through mining, and the developer is relieved of the obligation of obtaining a mining permit or license because it is expected that the developer will move as quickly as possible through the planning, permitting and site-preparation phases. Where activity within the definition of surface mining is undertaken simply to make land more attractive to potential purchasers, that activity is not concurrent with and incidental to the construction of a building.

IV

■ Linde also asserts that it should be relieved of any but nominal civil penalties. Concerning the seriousness of the violation, Linde notes that the roughly four-acre area that was disturbed is currently terraced and seeded in accordance with an erosion and sedimentation control plan and contends that further reclamation at this point would only interfere with the Wal–Mart development. As for culpability, Linde asserts that Eric Linde believed based on his extensive experience that he was engaging in normal construction excavation activity.

■ So long as the penalties imposed "reasonably fit" the violations, this Court will uphold the Board's determination. *Wilbar Realty, Inc. v. Department of Environmental Resources,* 663 A.2d 857 (Pa.Cmwlth.1995), *appeal denied,* 544 Pa. 619, 674 A.2d 1079 (1996). The initial $5000 penalty was based on an assessment that the violation was at the high end of the medium range of seriousness, for $2500, and in the middle of the range of recklessness, for another $2500. Notably missing from Linde's analysis is the effect of Linde's defiance of DEP's compliance orders. Section 21(a)(3) of the Noncoal SMCRA, 52 P.S. § 3321(a)(3), provides that where a violation has led to a cessation order, if there is a failure to correct, a minimum penalty of $750 per day shall be assessed for each day beyond the period allowed for correction. As the Board noted, the adding up of the fines of $750 per day from September 1 through September 30, 1993, for a total of $22,500, involved essentially no discretion. The Court sees no reason to disturb the judgment of the Board that the penalties were appropriate to fit the violations.

■ Finally, Linde asserts that DEP lacked "jurisdiction" over it because the definition of "Operator" in Section 3 of the Noncoal SMCRA excludes independent contractors. Linde contends that it was an independent contractor in relation to BGM and that only an operator can commit a violation of the statute. It maintains that this question was raised when Eric Linde testified that he once asked DEP officials why the mining violation order was not issued against Goyette, or at least concurrently with Linde, in view of BGM's responsibility for financing, zoning compliance and so on for the proposed BGM building. The Board considered this issue to be raised for the first time in post-hearing briefs and re-

fused to consider it, based on the Board's consistent holdings.

In *Newtown Land Ltd. Partnership v. Department of Environmental Resources,* 660 A.2d 150 (Pa.Cmwlth.1995), this Court, applying provisions formerly found at 25 Pa. Code §§ 21.51 and 21.52, which were identical to provisions now found at 25 Pa.Code §§ 1021.51 and 1021.52, held that issues not encompassed in the appellant's notice of appeal to the Board, absent a showing of good cause, were outside the jurisdiction of the Board to consider. The Court notes that Linde does not question the Board's subject matter or personal jurisdiction. Rather, it asserts only that DEP committed an error of law in enforcing the Noncoal SMCRA. In view of the foregoing, the order of the Board is affirmed.

### ORDER

AND NOW, this 15th day of April, 1997, the order of the Environmental Hearing Board is affirmed.

RODGERS, Senior Judge, dissents.