**Catharine R. SCANLON, Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, DEPARTMENT OF AGING, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 1999.
Decided Oct. 19, 1999.

Mark W. Voigt, Huntingdon Valley, for petitioner.

Jacqueline M. Welby, Harrisburg, for respondent.

Before SMITH, J., LEADBETTER, J., and JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

Catharine R. Scanlon (Scanlon) petitions for review from the March 1, 1999 order of the Department of Public Welfare (DPW) that adopted in its entirety the recommendation of the Bureau of Hearings and Appeals to deny Scanlon's appeal of the Department of Aging's (PDA) May 14, 1998 determination denying her application for PACE [1] benefits. We affirm.

On May 9, 1998, Scanlon filed an application for the renewal of PACE benefits for the year 1998. (Reproduced Record "R.R." 37a). In her application for benefits, Scanlon reported that she had received $10,893.00 in social security income for the year 1997 and that her total income for the year was $13,685.40. (*Id.*). As part of her application, Scanlon attached social security form 1099. That form indicated that Scanlon received social security income in the amount of $31,227.60 in 1997; however, it also indicated that $20,334.00 of the $31,227.60 received was attributable to years prior to 1997. (R.R. 49a). Because Scanlon *received* more than $14,000.00 in 1997, PDA denied her application for PACE benefits. (R.R. 57a).

Scanlon appealed PDA's decision on June 12, 1998, and a formal hearing was scheduled for September 15, 1998. At that time, the parties agreed to submit their arguments on briefs. Thereafter, on March 1, 1999, the hearing officer recommended that Scanlon's appeal be denied. By order of the same date, DPW adopted the hearing officer's recommendation in its entirety. This appeal followed.

■ On appeal, Scanlon raises two issues: 1) whether PDA erred in denying her benefits based upon the receipt of past due social security benefits in 1997 when, in fact, those benefits were attributable to years prior to 1997 and 2), whether the denial of Scanlon's application for PACE benefits is contrary to the legislative intent and humanitarian purposes of the program's enabling legislation. On review, we are limited to determining whether the necessary findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether con-

---

1. PACE is an acronym for Pharmaceutical Assistance Contract for the Elderly. The PACE program was established by the Pharmaceutical Assistance Contract for the Elderly Act, Act of November 4, 1983, P.L. 217, *as amended,* 62 P.S. §§ 2901–2904, repealed by the Act of August 14, 1991, P.L. 342. The subject matter of the repealed sections is now found in Sections 501 to 552 of the State Lottery Law (Law), Act of August 26, 1971, P.L. 351, *as amended,* 72 P.S. §§ 3761–501–3761–522.

stitutional rights were violated. *Chartiers Community Mental Health and Retardation Ctr., Inc. v. Department of Public Welfare,* 696 A.2d 244 (Pa.Cmwlth.1997).

■ The PACE program operates pursuant to the Law.[2] The purpose of the program is to assist the Commonwealth's elderly citizens in meeting the cost of life-saving prescription drugs. Section 501 of the Law, 72 P.S. § 3761–501.

The Law requires that PDA adopt regulations relating to the determination of eligibility of prospective claimants and providers. Section 503 of the Law, 72 P.S. § 3761–503. The Law further mandates that in order to be eligible for PACE benefits, the maximum annual income of a prospective single claimant cannot exceed $14,000.00. Section 502 of the Law, 72 P.S. § 3761–502. PDA's regulations require that the total income for the year preceding the year in which the claimant applies for PACE benefits be considered in determining a claimant's eligibility. 6 Pa. Code § 22.24(d).

> The Law defines "income" as
>
> [a]ll income from whatever source derived, including, but not limited to, salaries, wages, bonuses, commissions, income from self-employment, alimony, support money, cash public assistance and relief, the gross amount of any pensions or annuities, including railroad retirement benefits, all benefits *received* under the Social Security Act (49 Stat. 620, 42 U.S.C. § 301 et seq.) (except Medicare benefits), all benefits received under State unemployment insurance laws and veterans' disability payments, all interest received from the Federal Government or any state government or any instrumentality or political subdivi-

sion thereof, realized capital gains, rentals, work[ers'] compensation and the gross amount of loss of time insurance benefits, life insurance benefits and proceeds, except the first $5,000 of the total death benefits payments, and gifts of cash or property, other than transfers by gift between members of a household, in excess of a total value of $300, but shall not include surplus food or other relief in kind supplied by a government agency or property tax rebate.

Section 502 of the Law, 72 P.S. § 3761–502 (emphasis added).[3]

Scanlon maintains that since PDA's regulations do not address her situation, they are ambiguous and that therefore, this Court should look to federal authority, i.e. the Internal Revenue Code, for guidance. Specifically, Scanlon argues that the Internal Revenue Code allows a taxpayer the discretion to treat lump-sum payments of social security benefits one of two ways: the taxpayer may 1) report all the social security income benefits as received in the current tax year or 2), separately calculate the amount of benefits that would have been taxable if each prior year's benefits had been received in the correct year. *See* 1 I.R.C. § 86(e).

In support of her argument that the Law is ambiguous and that therefore, we should look to federal authority, Scanlon cites *Oriolo v. Department of Public Welfare,* 705 A.2d 519 (Pa.Cmwlth.1998) and *Meier v. Maleski,* 670 A.2d 755 (Pa. Cmwlth.1996), *aff'd,* 549 Pa. 171, 700 A.2d 1262 (1997). We conclude, however, that the terms comprising the definition of "income" in Section 502 of the Law are not ambiguous.

■ As we have stated,

regulations further lists those sources of income that are excluded in the calculation of a claimant's annual income. The income exclusions listed in the regulations do not address the situation where the interest in an asset accrues, but the asset itself is not acquired until a later time.

---

**2.** Section 508 of the Law, 72 P.S. § 3761–508, sets forth the means by which the State Lottery Fund finances the PACE program.

**3.** PDA's regulations provide that all those sources of income delineated in the Law are to be included as sources of income in determining eligibility for PACE benefits. *See* 6 Pa.Code § 22.24(b). Section 22.24(c) of the

[w]hen reviewing agency interpretation of statutes they are charged to enforce, our Supreme Court, has adopted a "strong deference" standard for reviewing agency interpretations of statutes they are charged to enforce. Under the "strong deference" standard, if we determine that the intent of the legislature is clear, that is the end of the matter and we, as well as the agency, must give effect to the unambiguously expressed intent of the legislature. If, however, we determine that the precise question at issue has not been addressed by the legislature, we are not to impose our own construction on the statute as would be necessary in the absence of an administrative interpretation, but review the agency's construction of the statute to determine whether that construction is permissible. We must give deference to the interpretation of the legislative intent of a statute made by an administrative agency only where the language of that statute is not explicit or ambiguous. 1 Pa.C.S. § 1921(c)(8). A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations.

*Bethenergy Mines v. Department of Environmental Protection*, 676 A.2d 711, 715 (Pa.Cmwlth.1996) (citations omitted).

The Law mandates that "all benefits *received* under the Social Security Act" be considered income. Section 502 of the Law, 72 P.S. § 3761–502 (emphasis added). The term "receive" is defined as "to take possession or delivery of; to come into possession of: ACQUIRE." Webster's Third New International Dictionary 1894 (1993).

Scanlon did not take possession of or acquire the additional monies until 1997. PDA's interpretation of the term "received" is consistent with its common usage and the applicable PDA regulations. Section 22.24(d) of the regulations illustrates that all income acquired between January and December of a given year is

to be considered as income. Section 22.24(d) provides that:

[a]n applicant shall declare the total annual income for the calendar year immediately preceding the year in which the applicant applies to participate in PACE.

Example—An applicant applies to participate in the PACE Program on August 16, 1990. The applicant shall declare his total annual income for the previous year, which is the calendar year 1989. Accordingly, the applicant shall declare all of the income which he received from January 1, 1989 up to and including December 31, 1989.

6 Pa.Code § 22.24(d).

The Law requires that PDA consider any social security funds *received* in a given calendar year to determine a claimant's income for purposes of establishing eligibility for the PACE program. The term " received" is not susceptible to two or more reasonable interpretations. Accordingly, we conclude that the Law is not ambiguous and therefore, need not turn to the rules of statutory construction to ascertain its meaning.[4]

In any event, we would note that Scanlon's reliance on *Oriolo* and *Meier*, is misplaced. In *Oriolo*, the claimant, after being admitted to a nursing home but prior to filing for medical assistance benefits, transferred all of the resources jointly owned by her and her husband into her husband's name alone. Upon receiving the claimant's application for medical assistance benefits, DPW determined that her resources exceeded the appropriate medical assistance resource limits. Accordingly, DPW denied her application.

The *Oriolo* claimant appealed to this Court, arguing that the transfer of resources to her spouse rendered her eligible for medical assistance benefits at the time of her application. We disagreed.

To determine whether an institutionalized spouse is eligible for medical assis-

4. *See* Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501–1991.

tance benefits, DPW's regulations require that it calculate the non-institutionalized spouse's share of resources. 55 Pa.Code § 178.123(a)(1). The "spousal share" is one half of the "total countable verified resources owned by the couple" when one of them is admitted to an institution. 55 Pa.Code § 178.121(g). After determining the non-institutionalized spousal share of resources, DPW must then determine whether the institutionalized spouse is eligible to receive medical assistance benefits. 55 Pa.Code § 178.124. To make this determination, the regulations require that DPW consider "the couple's countable verified resources." 55 Pa.Code § 178.124(a)(1).

The dispute in *Oriolo* centered on the term "couple's resources." DPW's regulations, however, did not define the term. In our analysis, we looked to the federal statute that addressed grants to the states for medical assistance programs.[5] That statute made it clear that all resources held by *either* spouse was attributable to the institutionalized spouse when initially determining his or her eligibility for medical assistance benefits.

We also noted in *Oriolo* that DPW's interpretation of the term "couple's resources" further supported its determination that the resources of a "couple" means more than just those resources owned jointly. DPW interpreted the term "couple's resources" to mean not only those resources owned jointly, but also those resources owned by the claimant alone and by her husband alone.

Guided by the federal statute and the well-settled principle that we must give great deference to an agency's interpretation of its own regulations,[6] we concluded in *Oriolo* that DPW correctly determined that the assets owned by the claimant's husband were attributable to her for the purposes of calculating her resource eligibility for medical assistance benefits. Accordingly, we affirmed.

In *Meier*, several doctors brought suit against the Commonwealth Insurance Commissioner and the director of the Medical Professional Liability Catastrophe Loss Fund (Fund). The Fund mandated that an annual surcharge be levied on all health care providers entitled to participate in the Fund.[7] The surcharge was based upon a percentage of the costs of professional liability insurance and an additional amount necessary to accumulate an additional $15,000,000.000. The doctors alleged that since the Fund had accumulated monies in excess of $15,000,000.00, they were entitled to a reduction in the surcharges for upcoming years. This argument was premised on the assumption that the $15,000,000.00 was a cap on the Fund's balance.

In *Meier*, the issue was whether the provisions of the Health Care Services Malpractice Act were ambiguous. We indeed concluded that the provisions of the statute were ambiguous, and therefore, we used the considerations found in Section 1921(c) of the Statutory Construction Act[8] to determine their meaning. We did not consider any federal authority in reaching

---

5. *See* Section 303 of the Medicare Catastrophic Coverage Act, 42 U.S.C. § 1396r–5 (1997).

6. *See Linde Enters., Inc. v. Department of Environmental Protection*, 692 A.2d 645 (Pa. Cmwlth.), *appeal denied*, 549 Pa. 707, 700 A.2d 445 (1997); *Nationwide Mut. Ins. Co. v. Foster*, 143 Pa.Cmwlth. 433, 599 A.2d 267 (1991).

7. Section 701(e)(1) of the Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. § 1301.701(e)(1).

8. Section 1921(c) provides that where the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: (1) the occasion and necessity of the statute, (2) the circumstances under which it was enacted, (3) the mischief to be remedied, (4) the object to be attained, (5) the former law, if any, including other statutes upon the same or similar subjects, (6) the consequences of a particular interpretation, (7) the contemporaneous legislative history and (8), the legislative and administrative interpretations of such statute. 1 Pa.C.S. § 1921(c).

our determination that $15,000,000.00 was the minimum amount of monies to be accumulated in the Fund, but not a statutory cap.

Contrary to Scanlon's assertions, however, neither *Oriolo* nor *Meier* stands for the proposition that we *must* look to federal authority to interpret ambiguous statutes. Indeed, our research has failed to disclose any appellate decision holding that in the absence of any Pennsylvania statute, case law or regulations, we must look to federal authority to ascertain the meaning of a state statute.

In her second argument on appeal, Scanlon maintains that PDA's denial of her application is contrary to the humanitarian purposes of PACE as set forth in the program's enabling legislation. The purpose of the Law is to assist the Commonwealth's elderly citizens in meeting the costs of life-sustaining prescription medications. Section 501 of the Law, 72 P.S. § 3761–501. The objectives of PDA are:

> (1) to establish a cabinet-level State agency whose jurisdiction, powers and duties specifically concern and are directed to advancing the well-being of Pennsylvania's older citizens;
>
> (2) to effect the maximum feasible coordination of, and eliminate duplication in, the Commonwealth's administration of certain Federal and State programs for older Pennsylvanians;
>
> (3) to further promote the efficient delivery of certain social and other services to older Pennsylvanians; and
>
> (4) to promote the creation and growth of independent clubs and associations of older Pennsylvanians and related activities which give promise of assisting older persons to maintain lives of independence and dignity; involvement in the social, economic and political affairs of their communities; and dignified and efficient assistance when disabled or impaired.

Section 2201–A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, added by Section 6 of the Act of June 20, 1978, P.L. 477, *as amended,* 71 P.S. § 581–1.

■ Scanlon is correct in her statement that the purpose of PACE is to benefit older Pennsylvanians who often face high pharmaceutical bills. We are mindful, however, that the PACE program is not without limits. The Law itself provides that the Commonwealth "hereby continues a *limited* State pharmaceutical program for the elderly." Section 501 of the Law, 72 P.S. § 3761–501 (emphasis added). One such limit is that a claimant may not have an annual income in excess of $14,000.00. The limit is, of course, the Legislature's means of enabling PDA to assist as many citizens as possible with the funds available to it.

■ PDA does not have the discretion to award a claimant benefits where the claimant does not meet all of the eligibility requirements. Scanlon had over two and one-half times the maximum annual income in 1997 and may, depending on her income, be eligible for PACE benefits in future years. Because of her income, PDA had no other option but to deny Scanlon's application for benefits.

Accordingly, based upon the foregoing, we affirm.

### ORDER

AND NOW, this 19th day of October, 1999, the order of the Pennsylvania Department of Public Welfare, dated March 1, 1999, is hereby affirmed.