**NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant,**

v.

**Daniel W. LEHMAN & Delores Lehman, Appellees.**

**No. 96 MDA 1999.**

Superior Court of Pennsylvania.

Argued Sept. 2, 1999.
Filed Nov. 15, 1999.
Reargument Denied Jan. 26, 2000.

Gregory F. Lepore, Lansdale, for appellant.

Robert F. Claraval, Harrisburg, for appellees.

Before JOHNSON, JOYCE, and TAMILIA, JJ.

JOHNSON, J.

¶ 1 This appeal presents the question of whether an insurer may deny underinsured motorist coverage when its insured settles his or her claim with a tortfeasor for the limits of available liability insurance without the consent of the insurer as

required by the policy. We conclude that the insurer may not deny underinsured motorist coverage unless it demonstrates that its interests were actually prejudiced by the settlement. Accordingly, we affirm the decision of the trial court granting the insured's motion for summary judgment on the insurer's liability to the insured for underinsured motorist coverage.

¶ 2 Underinsured motorist coverage (UIM coverage) protects an insured driver from the risk that a negligent driver of another car will cause injury to the insured and will have inadequate liability coverage to compensate the insured for injuries sustained. *See Daley–Sand v. West American Insurance Co.*, 387 Pa.Super. 630, 564 A.2d 965 (1989). The Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa.C.S. §§ 1701–1799.7, requires that:

No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth ... unless uninsured and underinsured motorist coverages are offered therein or supplemental thereto....

75 Pa.C.S. § 1731(a). UIM coverage is defined as "protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles." 75 Pa.C.S. § 1731(b). An underinsured motor vehicle is one "for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages." 75 Pa.C.S. § 1702. Thus, to claim UIM coverage an injured insured who carries UIM coverage must show that he or she has suffered losses or damages greater than the amount available under the limits of the tortfeasor's insurance policy. *See* 75 Pa. C.S. §§ 1702, 1731.

¶ 3 In December 1990, Daniel W. Lehman was injured as a result of an accident while driving his motorcycle. Lehman was stopped on Route 22 at Devonshire Road in Dauphin County when a car driven by Kenneth Myers struck him. Myers had cut in front of a car driven by Martha Warner, and Warner's vehicle struck Myers's vehicle and pushed it into Lehman's motorcycle. At the time of the accident, Lehman was insured by Nationwide Mutual Insurance Company (Nationwide) under an insurance policy that provided UIM coverage.

¶ 4 Although, initially, Lehman's prognosis was not severe, he eventually had to undergo three back surgeries. These injuries eventually necessitated Lehman's retirement from his position at the Central Dauphin School District. In April 1992, Mr. and Mrs. Lehman (the Lehmans) brought suit against Myers and Warner.

¶ 5 Lehman periodically informed his insurance agent from Nationwide, Joyce Potteiger, of his condition and deteriorating prognosis. In a letter dated April 21, 1993, Potteiger acknowledged that Lehman's damages placed UIM coverage at issue and that, therefore, she had requested that "Nationwide pull [Lehman's] records." Defendants' Brief in Support of Cross–Motion for Summary Judgment, Appendix 7. Lehman also informed Potteiger that the case against Myers and Warner was listed for trial in January of 1994. Trial Court Opinion, 12/8/98, at 2. However, as a result of additional necessary surgery for Lehman, the trial was continued until August 1994.

¶ 6 In July 1994, the Lehmans' attorney offered to settle the case with both Myers and Warner for the policy limits, which was $100,000 each. On August 12, 1994, Warner's attorney offered the Lehmans $80,000 to settle that portion of the case against her, which Warner's attorney later increased to the $100,000 policy limit. Warner's attorney presented the last offer on Thursday, August 18, 1994, four days before the trial was scheduled to begin on Monday, August 22, 1994.

¶ 7 On Friday, August 19, 1994, the Lehmans' attorney faxed a letter to Nationwide's adjuster requesting consent to settle, stating that he needed Nationwide's

answer by noon on Monday, August 22. The letter to Nationwide stated that Warner was a young female college student in her early twenties who had no assets other than her insurance policy. On Monday, August 22, 1994, Nationwide notified the Lehmans' attorney that it had previously closed its claim file and the file was in storage in its home office in Ohio. Nationwide further indicated that it could not consent to a settlement agreement until it received and reviewed its file and other information regarding Warner's potential assets.

¶ 8 Nationwide made no further response, and on August 22, 1994, the Lehmans agreed to the settlement with Warner without Nationwide's consent. The Lehmans also signed a release that immunized Warner from any further liability arising from the accident. The Lehmans then tried the case against Myers.

¶ 9 On August 26, 1994, the jury returned a verdict in the amount of $265,000, finding Warner 85% responsible and Myers 15% responsible. Myers's insurer paid his portion of the verdict to the Lehmans. After the trial, the Lehmans requested UIM coverage from Nationwide for the unpaid portion of the judgment. Nationwide did not respond to this request, but instead filed an action for declaratory judgment.

¶ 10 In Nationwide's complaint for declaratory relief, it requested the court to: (1) determine and adjudicate the rights of the parties; (2) declare that Nationwide had no obligation to provide UIM coverage because the Lehmans settled and released Warner from liability without Nationwide's consent; (3) declare that the Lehmans violated Nationwide's policy regarding the requirement that an insured obtain Nationwide's written consent before settling bodily injury claims; and (4) declare that the Lehmans' attorney's notice to Nationwide of the policy limit offer from Warner did not provide Nationwide with sufficient time to determine whether consent should be given.

¶ 11 The Lehman's counterclaimed for declaratory relief seeking an order that would preclude Nationwide from refusing to provide UIM coverage on the basis that the Lehmans had failed to obtain consent to the settlement with Warner. At the close of discovery, both parties filed motions for summary judgment. On December 8, 1998, the court granted the Lehmans' motion, but denied Nationwide's. Nationwide now appeals that decision.

Nationwide presents two questions for our review:

1. DID THE TRIAL COURT ERR IN REFUSING TO REQUIRE THAT AN INSURER BE GIVEN A REASONABLE AND EQUITABLE PERIOD OF TIME TO DETERMINE WHETHER IT WILL ALLOW ITS SUBROGATION RIGHTS AGAINST AN INSURER TO BE TERMINATED?

2. DID THE TRIAL COURT ERR IN DETERMINING THAT AN INSURER'S RIGHTS ARE NOT PREJUDICED MERELY BECAUSE THE PUNITIVE DEFENDANT DOES NOT HAVE SIGNIFICANT ASSETS AT THE TIME THAT THE REQUEST TO WAIVE SUBROGATION IS MADE?

Brief for Appellant at 3.

¶ 12 The first question that Nationwide has presented for our review is whether it was justified in withholding consent from the Lehmans because Nationwide had insufficient time to evaluate its future subrogation rights against Warner. Brief of Appellant at 13 & 16. Accordingly, we will address this issue even though we find that it has no effect on the outcome of our analysis. The second question presented for our review implicates two issues. First, we must determine whether the trial court committed an error of law in requiring Nationwide to show that it was actually prejudiced by the Lehmans' failure to obtain consent before settlement. Second,

we must determine whether the trial court abused its discretion in determining that there remained no genuine issue of material fact as to whether Nationwide's interests were actually prejudiced by the settlement and that the Lehman's were entitled to judgment as a matter of law.

¶ 13 When reviewing an order granting summary judgment, an appellate court must examine the record in the light most favorable to the nonmoving party, accepting as true all well-pleaded facts and giving that party the benefit of all reasonable inferences drawn from those facts. *See Eaddy v. Hamaty*, 694 A.2d 639, 641 (Pa.Super.1997). We may reverse entry of summary judgment only if the trial court erred as a matter of law or abused its discretion. *See id.* While appellants need not present their entire case in opposing summary judgment, they cannot rest upon mere allegations in the pleadings but must present depositions, affidavits, or other documents that show a genuine issue of material fact exists and that the moving party is not entitled to judgment as a matter of law. *See Brecher v. Cutler*, 396 Pa.Super. 211, 578 A.2d 481, 483 (1990). Bald unsupported assertions of conclusory accusations cannot create genuine issues of material fact. *Golaschevsky v. Commonwealth of Pennsylvania, Dep't. of Envtl. Resources*, 683 A.2d 1299 (Pa.Cmwlth. 1996).

¶ 14 The trial court determined that the issue before it was "whether an insured may recover from his carrier where the carrier never consented to the settlement between the insured and the tortfeasor and where the carrier suffered no prejudice as a result of the settlement." Trial Court Opinion at 3. The trial court, in reliance upon *Prudential Property & Casualty Ins. Co. v. Nayerahamadi*, 593 F.Supp. 216 (E.D.Pa.1984), determined that the "first inquiry should be whether the settlement was reasonable and whether Nationwide was prejudiced in any way by the settlement." Trial Court Opinion at 4. In *Nayerahamadi*, the district court

stated that if the settlement was reasonable, the insurer could not justifiably have withheld consent, and thus could not have shown that it was prejudiced by the insured's failure to obtain consent before settling with the tortfeasor. *Nayerahamadi*, 593 F.Supp. at 218. In accordance with *Nayerahamadi*, the trial court then imposed upon Nationwide the burden of showing that the Lehmans' settlement with Warner was unreasonable and that the Lehmans' failure to obtain consent before settlement caused Nationwide prejudice. In so doing, the trial court noted that the United States Court of Appeals for the Third Circuit disagreed with the district court's holding in *Nayerahamadi* because the Third Circuit was not persuaded that Pennsylvania law, when declared, would require that an insurer show prejudice in order to deny UIM coverage. *See Fisher v. USAA Cas. Ins. Co.*, 973 F.2d 1103, 1105 (3d Cir.1992). The trial court concluded that Nationwide had no reasonable basis for refusing to consent to the settlement and that it was unable to show that it was actually prejudiced by the Lehmans' failure to obtain consent before the settlement. Trial Court Opinion at 7. Accordingly, the court held that Nationwide was liable to the Lehmans for UIM coverage. *Id.*

¶ 15 The first question that Appellant Nationwide has presented for our review is whether it was justified in withholding consent from the Lehmans because Nationwide had insufficient time to evaluate its future subrogation rights against Warner. This Court discussed UIM coverage, consent-to-settle clauses and an insurer's subrogation rights in *Daley–Sand v. West Am. Ins. Co.*, 387 Pa.Super. 630, 564 A.2d 965 (1989). In *Daley–Sand*, the tortfeasor offered to settle with the insured on October 14, 1987, for the full amount of coverage. Immediately thereafter, the insured notified its insurer of the settlement and asked for its consent to settle and to release the tortfeasor. The insurer withheld its consent for six months, stating only

"that it was continuing its investigation into whether, in giving consent, it would be relinquishing subrogation opportunities." *Daley–Sand*, 564 A.2d at 967. As a result of the insurer's continued refusal to consent to the settlement, the insured was forced to petition the court to resolve the subrogation issue. The insured argued, *inter alia,* that the insurer's refusal to consent effectively prevented her from collecting her insurance benefits, violated public policy, and frustrated her legitimate expectations. *Id.* at 968.

¶ 16 In November 1988, one year after the insured had requested the insurer's consent to settle, the court granted the insured's petition and fashioned an equitable remedy. The court authorized the insured to settle with the tortfeasor and execute a full release, while at the same time preserving the insured's right to proceed with arbitration against the insurer to determine the insured's entitlement to UIM coverage. However, the court stayed this relief for a period of thirty days to provide the insurer time to pay the insured the full amount of the settlement, thus perfecting its subrogation rights. *Id.*

¶ 17 On appeal, the insurer challenged the propriety of the court's equitable remedy. We affirmed on the grounds that the insurer's use of the consent to settle clause frustrated public policy by depriving the insured of benefits for which she had paid. In response to the insurer's argument that the operation of the consent-to-settle clause was reasonable in that it gave the insurer time to evaluate its future subrogation rights, we stated:

> [Insurer] justifies withholding consent to settle by elevating its future subrogation rights to primary importance, suggesting that it may take as long as it chooses to research its subrogation opportunities and thus to indefinitely postpone payment of UIM benefits. In so arguing, [insurer] essentially proffers that its subrogation rights are primary over all

other rights at issue. We cannot seriously entertain this proposition. *Id.* at 969.

¶ 18 Nationwide contends that our holding in *Daley–Sand* requires the insured to give the insurer "thirty (30) days to consider the request to waive subrogation, and if the insurer after thirty (30) days did not consent to the release of the tortfeasor, the insurer would be required to substitute its own funds for that [sic] of the tortfeasor's insurance carrier and allow the [insured] to proceed to underinsured motorist coverage." Brief of Appellant at 16. The Pennsylvania Defense Institute, amicus curiae, also relies on *Daley–Sand* for the proposition that an insurer is entitled to thirty days to consider an insurer's request to settle with a tortfeasor. We decline to adopt this argument. It was the trial court in *Daley–Sand* that fashioned the thirty-day equitable remedy. A careful review of *Daley–Sand* reveals that this Court simply affirmed the equitable remedy fashioned by the trial court. Nowhere did we adopt the thirty-day remedy as one to be used in every case or even in cases similar to that presented to us in *Daley–Sand.*

¶ 19 The thrust of this Court's decision in *Daley–Sand* was that an insurer cannot unreasonably withhold from an insured the insurer's consent to settle with a tortfeasor. *Id.* at 969. In *Daley–Sand*, we considered the "chief issue" on appeal to be "whether [insurer's] withholding consent and thus effectively denying UIM benefits violates legislative intent and public policy." *Id.* Because the MVFRL requires that every automobile insurer in this Commonwealth offer UIM coverage, we held that "the operation of the consent to settle clause in this case as now written frustrates public policy" because it denied the insured the benefit of her UIM coverage. *Id.* at 971.

¶ 20 The record establishes that Nationwide was aware of the ongoing case between Lehman and the two tortfeasors

from its inception and had ample notice that Lehman's deteriorating condition implicated UIM coverage. On several occasions, the Lehmans contacted Potteiger. In a letter dated April 21, 1993, over one year before Lehman requested Nationwide's consent to settle, Potteiger wrote to Lehman: "I understand per your conversation with Beverly, you're questioning which tort position you were carrying and whether or not you carried stacked Uninsured and *Underinsured coverages when your accident occurred on 12/24/90.* I've reviewed your file and *requested Nationwide pull your records.*" Defendant's Brief in Support of Cross–Motion for Summary Judgment, Appendix 7 (emphasis added).

¶ 21 "It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal." *Workmen's Compensation Appeal Bd. v. The Evening Bulletin*, 498 Pa. 219, 224, 445 A.2d 1190, 1192 (1982) (citations omitted); *Indovina v. Metro. Life Ins. Co.*, 334 Pa. 167, 170, 5 A.2d 556, 558 (1939) (" 'The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest.' " (quoting *Mutual Life Ins. Co. v. Hilton–Green*, 241 U.S. 613, 622, 36 S.Ct. 676, 60 L.Ed. 1202 (1916))).

¶ 22 Thus, Nationwide, through its agent, had knowledge that Lehman's accident implicated UIM coverage. Alec Driskill, a Nationwide adjuster, testified that Nationwide's policy is to periodically make a phone call or write a letter "to establish if it appeared that there would be an underinsured motorist claim pending, and ... get an idea of what was going on with the case and with [the] thoughts and impressions of ... the ... counsel for the injured party." Deposition of Alec Driskill, 11/6/95, at 66. In addition, Driskill acknowledged that the general procedure includes doing an "assets check" in order to attach any apparent assets. *Id.* at 30.

¶ 23 However, in the instant case, the record establishes that Nationwide neither requested periodic updates nor performed an assets check on Warner. Nationwide's records reflect that they closed the Lehman file on April 6, 1992, and did not reopen it until August 22, 1994. *Id.* at 15. Because the file was closed and was not reopened until August of 1994, Nationwide failed to pursue its usual policy of periodically contacting the injured party's counsel to check on the status of negotiations and to determine whether or not there would actually be a UIM claim. Between April 21, 1993, the date on which Potteiger wrote to the Lehmans stating that she had requested Nationwide "pull [Lehman's] records," and August 22, 1994, the date on which the Lehmans' attorney settled with Warner, Nationwide made no attempt to run a routine credit check on Warner to check on her assets. *Id.* at 43–44. Had Nationwide performed even the most rudimentary of investigations into Warner's assets and earning capacity, it would have realized the futility of subrogation and the eminent reasonableness of the settlement for her policy limit. Therefore, Nationwide cannot now claim that it justifiably withheld consent when it had knowledge of a potential UIM claim and did nothing, at any point in time before settlement, to evaluate the assets of the tortfeasor.

¶ 24 Nationwide asserts that its inability to perform a credit check on Warner after the Lehmans' attorney requested its consent for settlement was the fault of the Lehmans' attorney because he did not provide Warner's social security number. Brief of Appellant at 14. However, the fact that Nationwide did not even have Warner's social security number over three years after the accident serves only to support our conclusion that Nationwide exercised a complete lack of diligence in handling this matter. On this record, the

time for evaluating future subrogation rights was ample. Accordingly, we conclude that Nationwide was not justified in withholding consent.

¶ 25 The second question presented for our review raises the issue of prejudice to Nationwide's interests. The propriety of the trial court's requirement that Nationwide demonstrate actual prejudice as a result of Lehman's failure to obtain consent before settlement with Warner raises a question of first impression in this Commonwealth. We hold that in order for an insurer to deny UIM coverage to an insured, where the insured settles with a tortfeasor for the limits of available liability insurance, and in contravention of the insurance policy's consent-to-settle clause, the insurer must show that its interests were prejudiced. We note that our decision here adopts a rule that is in accord with the law in many other jurisdictions. *See Marsh v. Prestige Ins. Group*, 58 Ill. App.3d 894, 16 Ill.Dec. 390, 374 N.E.2d 1268, 1270 (1978) ("insurer must show that the alleged breach substantially prejudiced the insurer"); *Federated Serv. Ins. Co. v. Granados*, 133 Or.App. 5, 889 P.2d 1312, 1315–16 (1993) ("If the tortfeasor is judgment proof, defendants' breach of the consent-to-settle provision would not have prejudiced [insurer]."). *See also Thompson v. Am. States Ins. Co.*, 687 F.Supp. 559, 564 (M.D.Ala.1988) ("Before settlement with an uninsured motorist can be regarded as a breach of the no-consent-to-settlement exclusion clause sufficient to relieve the insurer of its liability under the uninsured motorist endorsement, such breach must be shown to be prejudicial to the insurer.").

¶ 26 Our decision here is guided by the Pennsylvania Supreme Court's decision in *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977). In *Brakeman*, the court addressed the enforceability of notice provisions in an insurance policy on which the insurer relied to deny primary liability coverage because the insured did not provide written notice of his claim "as soon as practicable" after the accident. *Brakeman*, 472 Pa. at 70, 371 A.2d at 195.

¶ 27 In *Brakeman*, the insured tortfeasor was involved in an accident on March 3, 1970. Brakeman, the injured party, sued the insured and on October 6, 1970, the insured notified his insurer of the accident and the suit. The insurer refused to defend the insured and denied any liability under the policy. The suit between Brakeman and the insured resulted in a consent judgment that awarded Brakeman the insured's policy limit. Brakeman then brought suit against the insurer to collect the judgment.

¶ 28 At trial, the jury found for Brakeman, but the court entered judgment notwithstanding the verdict. *See id.* at 69, 371 A.2d at 194. On appeal, this Court reversed the trial court's order on the grounds that delayed notice to an insurer does not relieve the insurer of liability under the policy if the insured can show that the insurer was not prejudiced by the untimely notice. *See Brakeman v. Potomac Insurance Co.*, 236 Pa.Super. 320, 344 A.2d 555 (1975). The Pennsylvania Supreme Court affirmed our decision, but required that the insurance company, not the insured, demonstrate prejudice. *See Brakeman*, 472 Pa. at 77, 371 A.2d at 198. The court followed the rationale of the Supreme Court of New Jersey in *Cooper v. Gov't. Employees Ins. Co.*, 51 N.J. 86, 93, 237 A.2d 870, 873 (1968), and concluded that insurance contracts, unlike contracts generally, are not the result of a dickering process between the insurer and insured but rather are the result of the insured's choice to accept the contract in a take it or leave it situation. *See id.* at 73, 371 A.2d at 196. The court admonished that a "proper analysis requires this reality be taken into account." *Id.* The court recognized, accordingly, that the interests of the insured required that the insurer demonstrate more than a technical violation of the insurance contract to substantiate a denial of coverage.

"The function of the notice requirements is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice nor to evade the fundamental protective purpose of the insurance contract to assure the insured and the general public that liability claims will be paid up to the policy limits for which premiums were collected. Therefore, unless the insurer is actually prejudiced by the insured's failure to give notice immediately, the insurer cannot defeat its liability under the policy because of the non-prejudicial failure of its insured to give immediate notice of an accident or claim as stipulated by a policy provision."

*Id.* at 75, 371 A.2d at 197 (quoting *Miller v. Marcantel,* 221 So.2d 557 (La.Ct.App. 1969)).

In short, the function of a notice requirement is to protect the insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the *reason behind the notice condition in the policy is lacking,* and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.

*Id.* at 75, 371 A.2d at 197 (emphasis added). Similarly, we conclude that the purpose of a consent-to-settle clause in an insurance policy is to protect against an insured prejudicing the insurer's interests. Where the insured settles with a tortfeasor without the insurer's consent and does not prejudice the insurer's interests, the purpose of the consent-to-settle clause is lacking. Although an insured's settlement with a tortfeasor necessarily prejudices the insurer's technical subrogation rights, the insurer's actual interests are not prejudiced by a settlement without its consent where the circumstances at issue render subrogation impracticable.

■ ¶ 29 Our conclusion derives from the proposition that "the right of subrogation may be contractually declared or founded in equity, *but even if contractually declared, it is to be regarded as based upon and governed by equitable principles.*" *Daley–Sand,* 564 A.2d at 970 (quoting *Allstate Ins. Co. v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021, 1023 (1987)). Furthermore, "subrogation is not an inflexible legal concept but, as an exercise of equitable powers, it is to be carried out with an ... 'exercise of proper equitable discretion, with a due regard for the legal and equitable rights of others.'" *Daley–Sand,* 564 A.2d at 970. Nationwide seeks to place its subrogation rights ahead of its insured's right to UIM coverage. However, Nationwide collected premiums from the Lehmans for the insurance policy and they legitimately expected UIM coverage. The Lehmans settled with Warner for the entire amount available under Warner's insurance policy limit and this amount was inadequate to compensate the Lehmans for their losses and damages. Therefore, the Lehmans were entitled to claim UIM benefits. *See* 75 Pa.C.S. §§ 1702, 1731(a), (b). Thus, under the principle of law that we here establish, the trial court did not commit an error of law in placing upon Nationwide the burden of coming forward and proving that the settlement prejudiced its interests in order to deny UIM coverage.

■ ¶ 30 Having concluded that the trial court did not commit an error of law, we must next determine whether it abused its discretion in determining that there remained no genuine issues of material fact as to whether the settlement prejudiced Nationwide's interests and that the Lehmans were entitled to judgment as a matter of law. The Lehmans filed their Cross–Motion for Summary Judgment stating that "the affidavits, answers to interrogatories, pleadings and depositions clearly indicate that there were no factual disputes ... [and that] Nationwide was not prejudiced and suffered no financial

loss because [the Lehmans] settled [their] case with [Warner]." In support of their motion, the Lehmans attached the sworn affidavit of Martha Warner in which Warner states that her assets total $700 in bank accounts and that she has student debt totaling $10,000. In response to the Lehmans' motion, Nationwide submitted only the affidavit of David E. Cole, Esquire, the state legal coordinator for Nationwide, stating simply that Warner "has no significant assets" and that Warner's "education would lead to employment and income sufficient to satisfy any subrogation action by Nationwide." Nationwide procured Cole's affidavit on February 8, 1998, over three and one half years after the Lehmans requested consent to settle with Warner. During this extended period of time, Nationwide's investigation produced nothing but an acknowledgment by Nationwide that Warner had no significant assets and speculation regarding Warner's future earning potential. Under these facts, we have no difficulty determining that Nationwide has "failed to produce facts essential to the cause of action ... which ... would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(2).

¶ 31 Nationwide has failed to show that its interests were prejudiced by the settlement, and thus, the purpose behind the consent-to-settle clause is lacking. To permit Nationwide to deny coverage in this situation would be to allow a forfeiture without any sound reason. This we will not do. Accordingly, we conclude that the trial court did not abuse its discretion in determining that there remained no genuine issues of material fact as to whether the settlement prejudiced Nationwide's interests and that the Lehmans were entitled to judgment as a matter of law.

¶ 32 Order **AFFIRMED**.