**United States Fire Insurance Company v. American National Fire Insurance Company**

*James B. Burns,* for plaintiff.

*Arthur W. Hankin, Adam M. Share* and *Sheryl Axelrod,* for defendant.

*John C. Sullivan,* for additional defendant.

SHEPPARD JR., *J.,* April 6, 2001—Third-party defendant Liberty Mutual Fire Insurance Company has filed a motion for summary judgment requesting that the joinder complaint of American National Fire Insurance Company against Liberty be dismissed. This motion raises, inter alia, several novel issues under Pennsylvania law concerning the relationship between a primary and an excess insurer. Because this court concludes that the primary insurer, Liberty, may have had a duty under two distinct theories to notify the excess insurer, American, that its interests were at risk, Liberty's motion is denied.

## BACKGROUND

Some time prior to 1995, I.A. Construction Company began operating as a subcontractor for James J. Anderson Construction Company Inc. Under the contract between I.A. Construction and Anderson (subcontract), I.A. Construction was responsible for providing insurance and

defending Anderson against any claims that arose from work done by I.A. Construction. To fulfill its obligations under the subcontract, I.A. Construction purchased a primary insurance policy with a limit of $2 million per occurrence from Liberty. I.A. Construction also purchased an excess policy with a limit of $20 million per occurrence from American. Under the American policy, I.A. Construction was obliged to give notice to American "[w]henever it appear[ed] that an occurrence, claim or 'suit' [was] likely to involve" the American policy. American policy at IV.C.1.a.[1]

On June 6, 1995, Keith Voiro, an employee of I.A. Construction, was injured at the Anderson construction site. When Voiro filed suit against Anderson on May 10, 1996,[2] Anderson tendered its defense to I.A. Construction. I.A. Construction, in turn, contacted Liberty, which provided the defense for Anderson in accordance with the Liberty policy's blanket additional insured provision.[3]

The *Voiro* action settled for $4.8 million on November 17, 1998, with Anderson's share amounting to $4 million. Liberty paid $2 million toward the *Voiro* settlement, but American refused to contribute, claiming that I.A. Construction had not notified it of the *Voiro* action or permitted it to participate in the defense of the case.

---

1. Neither the American policy nor the Liberty policy has a governing law provision. Because all relevant events have taken place in Pennsylvania and both parties rely exclusively on Pennsylvania law, this court will apply Pennsylvania law.

2. *Voiro v. PECO Energy and James J. Anderson Construction Co.,* C.P. Phila. May 1996, no. 1035 ("*Voiro* action").

3. Anderson met the criteria for an "insured" under the Liberty policy. See Liberty's memorandum exhibit E.

American alleges that Liberty was aware of the American policy and had information by March 6, 1998 that liability in the *Voiro* action could exceed $2 million, but did not contact American until September 4, 1998.

Because of American's refusal, Anderson's primary and excess insurers agreed to provide the remaining $2 million to complete the *Voiro* settlement.[4] U.S. Fire subsequently brought the instant action against American to recover the amount of its contribution under breach of contract and equitable subrogation theories. American filed the joinder complaint, which joins Liberty to the instant action and requests a declaratory judgment holding that Liberty is solely liable, liable over to American by way of contribution and/or indemnity and/or is jointly or severally liable with American.

## DISCUSSION

Liberty's motion seeks summary judgment based on asserted limits on duties owed to excess insurers.[5] Lib-

---

4. Anderson's primary insurer was Pennsylvania Manufacturers' Association Insurance Company. Its excess insurer was United States Fire Insurance Co.

5. Pennsylvania Rule of Civil Procedure 1035.2 allows a court to enter summary judgment "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action." A court must grant a motion for summary judgment when a non-moving party fails to "adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 101-102, 674 A.2d 1038, 1042 (1996), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996).

Where, however, there are disputed issues of material fact present, summary judgment may not be granted.

erty also asserts that the joinder complaint is invalid under Pennsylvania Rule of Civil Procedure 2252. In opposing summary judgment, the crux of American's argument is, broadly, that it should have been notified of the *Voiro* action:

"If Liberty Mutual believed that American National was obligated to provide excess coverage to defendant James J. Anderson in the *Voiro* case, then Liberty Mutual had a duty to timely report the *Voiro* loss to American National so as to permit American National to meaningfully participate in the preparation of the defense of the case.

"In addition, if Liberty Mutual believes that American National was obligated to provide excess coverage to defendant James J. Anderson in the *Voiro* case, then Liberty Mutual had a duty to timely report the *Voiro* loss to its alleged insured, Anderson, so as to permit American National to meaningfully participate in the preparation of the defense of the case." American's surreply at 4.

The facts alleged by American present a viable cause of action against Liberty under two alternate theories, although the specific theory on which American relies —that is, that Liberty had a duty to advise Anderson to contact its excess carrier (American)—is untenable.[6]

---

6. There is yet another theory, known as "triangular reciprocity," under which American might assert a cause of action. First adopted in *Transit Casualty Co. v. Spink Corp.,* 156 Cal. Rptr. 360 (Cal. Ct. App. 1979), the theory of triangular reciprocity recognizes the tensions among the insured, the primary insurer and the excess insurer. Because of these tensions, the theory holds that there is a tripartite duty of care among the three parties and apportions liability according to

Here, there are material facts in dispute that preclude granting summary judgment. In addition, the joinder complaint is valid under Rule 2252.

## I. *Liberty, As a Primary Insurer, May Have Had a Duty To Notify American, the Excess Insurer, of the* Voiro *Action*

### A. Pennsylvania Law Does Not Address in Depth the Duties of a Primary Insurer to an Excess Insurer

The relationship between a primary and an excess insurer is rife with potential conflicts of interest. Pennsylvania law recognizes these difficulties inherent in interactions between primary and excess insurance carriers:

"The relationship between the primary and excess carrier is an unusual one; each has a separate contract with the insured, but they have none with each other. Conflicts of interest invariably arise when the underlying tort injury is of such severity that a recovery over the limits

---

the comparative fault of each. As noted by other courts, however, triangular reciprocity has been roundly criticized by most courts that have considered it, including courts in the jurisdiction in which it was adopted. See *e.g., National Union Fire Ins. Co. of Pittsburgh, Pa. v. Insurance Co. of N. Amer.,* 955 S.W.2d 120, 136 (Tex. Ct. App. 1997) ("[t]riangular reciprocity has not been widely accepted"); *Fireman's Fund Ins. Co. v. Maryland Cas. Co.,* 26 Cal. Rptr. 2d 762, 771 n.13 (Cal. Ct. App. 1994) (triangular reciprocity "has failed to gain any currency"); *Certain Underwriters of Lloyd's v. General Accident Ins. Co. of Amer.* 699 F. Supp. 732, 739 (S.D. Ind. 1988) (rejecting triangular reciprocity and noting that the theory "has not been widely accepted").

In sum, this court believes that the theory is without merit and may not serve as a basis for American's claim.

of the primary policy is possible. In that circumstance, the excess carrier wishes the primary insurer to dispose of the case within its limits and is not unduly impressed with the primary insurer's desire to save some or all of its policy limits by a favorable verdict at trial. Conversely, the primary carrier is unlikely to have such paternalistic feelings as will induce it to concede its limits when there is some chance of obtaining a favorable verdict. In each instance, one carrier is to some extent gambling with the other's money." *Physicians Ins. Co. v. Callahan,* 167 Pa. Commw. 485, 499-500, 648 A.2d 608, 615-16 (1994). See also, *F.B. Washburn Candy Corporation v. Fireman's Fund,* 373 Pa. Super. 479, 485, 541 A.2d 771, 774 (1988) ("while the interests of a primary insurer are virtually unaffected by the existence of excess coverage, the interests of an excess insurer are very much affected by the actions taken by the primary carrier").

In an attempt to address these conflicts, Pennsylvania courts have allowed the excess insurer to be treated as the insured's subrogee through the doctrine of equitable subrogation. This doctrine is "a means of placing the ultimate burden of a debt upon the one who in good conscience ought to pay it, and is generally applicable when one pays out of his own funds a debt or obligation that is primarily payable from the funds of another." *High-Tech-Enterprises Inc. v. General Accident Insurance Co.,* 430 Pa. Super. 605, 609, 430 A.2d 639, 642 (1993). (citation omitted) To sustain a claim based on equitable subrogation, a purported subrogee—here the excess insurer—must establish five elements:

"(1) The claimant paid the creditor to protect its own interests;

"(2) The claimant did not act as a volunteer;

"(3) The claimant was not primarily liable for the debt;

"(4) The entire debt has been satisfied; and

"(5) Allowing subrogation will not cause injustice to the rights of others" [7] *Tudor Dev. Group Inc. v. United States Fidelity & Guaranty Co.,* 968 F.2d 357, 361 (3d Cir. 1992) (citing *United States Fidelity & Guaranty Co. v. United Penn Bank,* 362 Pa. Super. 440, 524 A.2d 958 (1987)).[8]

When the conditions for equitable subrogation are satisfied, an excess insurer steps into the shoes of the in-

---

7. In reviewing requests for subrogation, it has been held that "great care should be taken by the court that the subrogation will work no injustice to the rights of others." *U.S. Steel Homes Credit Corp. v. South Shore Development Corp.,* 277 Pa. Super. 308, 316, 419 A.2d 785, 790 (1980). (citation omitted) However, no case requires a plaintiff to plead that no injustice will result from granting the relief.

8. Although the *Tudor Development Group* court cited *United States Fidelity* as the source of this five-element test, a careful examination of the Superior Court's opinion in *United States Fidelity* reveals no evidence that the Third Circuit took the test from that case. In addition, no Pennsylvania court has explicitly adopted this test. There are Pennsylvania cases, however, that recognize each of these elements as being a prerequisite to equitable subrogation. See *Jacobs v. Northeastern Corp.,* 416 Pa. 417, 429, 206 A.2d 49, 55 (1965) (holding that "[r]ights of subrogation . . . are created by law to avoid injustice"); *Kaiser v. Old Republic Insurance Co.,* 741 A.2d 748, 754 (Pa. Super. 1999) (subrogee must act to protect its own interests), *High-Tech-Enterprises Inc.,* 430 Pa. Super. at 609, 430 A.2d at 642 (subrogee must not have primary liability for the debt); *Dominski v. Garrett,* 276 Pa. Super. 18, 25, 419 A.2d 73, 77 (1980) (a party may not invoke the doctrine of equitable subrogation if it has acted as a volunteer); *Hunsberger v. Perkiomen Nat'l Bank,* 108 Pa. Super. 443, 450, 164 A. 839, 841 (1933) ("[u]nless the surety pays the debt in full, he is not entitled to subrogation").

sured, and a primary insurer owes the same duty to an excess insurer that it would owe to the insured itself. *F.B. Washburn Candy Corp,* 373 Pa. Super. at 484-85, 541 A.2d at 774.[9]

Beyond these few cases addressing equitable subrogation, there is little Pennsylvania law discussing the relationship or duties running between a primary insurer and an excess insurer. In addition, no Pennsylvania cases address the duty of a primary insurer either to give notice of a claim to an excess insurer or to advise an insured that it should notify its primary carrier of a claim.[10]

## B. Even If American Is Anderson's Equitable Subrogee, Liberty Had No Obligation To Advise Anderson To Contact American

Based on the theory of equitable subrogation, American argues that it is Anderson's subrogee and that it has inherited the claims that Anderson could have brought against Liberty. American's surreply at 4. Among these claims, it asserts, is an action based on Liberty's violation of its obligation as a primary carrier to advise Ander-

---

9. The claims of a subrogee are subject to all defenses that could have been raised against the subrogor. *Public Service Mutual Insurance Co. v. Kidder-Friedman,* 743 A.2d 485, 488 (Pa. Super. 1999).

10. Such a duty to an insured would be part of the broader duty of good faith owed by an insurance carrier to an insured. See *Gilderman v. State Farm Insurance Co.,* 437 Pa. Super. 217, 226, 649 A.2d 941, 945 (1994) (insurer carrier owed insured duty of "utmost good faith" and fair dealing); *Strutz v. State Farm Mutual Insurance Co.,* 415 Pa. Super. 371, 375, 609 A.2d 569, 571 (1992) (calling such duties "fiduciary" in nature).

son of its duty to notify its excess carrier when excess coverage may be triggered.

Because no Pennsylvania case speaks to a primary insurer's duty to advise an insured, American directs the court to *Ralston Purina Co. v. Home Insurance Co.,* 760 F.2d 897 (8th Cir. 1985), which addressed the relationship among an insured and its two insurance carriers. In *Ralston,* neither the primary insurer nor the insured party had notified the excess carrier of a claim that resulted in an award in excess of the $100,000 primary insurance coverage. When the excess carrier denied coverage, the insured brought suit against both insurers, asserting a breach of fiduciary duty claim against the primary insurer for its failure to advise the insured that the excess carrier should be notified. At trial, the jury found in favor of both insurers, and the insured appealed.

On appeal, the Eighth Circuit found adequate evidence to support the jury's conclusion that the primary insurer had adequately advised the insured of the potential for liability in excess of $100,000. According to American, the fact that the court even addressed the sufficiency of the evidence "establishes that a primary carrier may be held liable to its insured in excess of the primary carrier's limits, for exposing its insured to amounts exceeding its policy, but failing to timely advise the insured to put its excess carrier on notice." American's memorandum at 13. (emphasis omitted)

In addition to its age and non-binding nature,[11] there are a number of reasons to reject the *Ralston* holding as

---

11. Even if the *Ralston* court had been interpreting Pennsylvania law, its conclusions still would not have been binding on this court.

proposed by American. First, nowhere in the opinion does the court explicitly state that a primary insurer has a duty to advise an insured that it should notify its excess carrier. Even if this principle is inferred from the court's analysis, the Eighth Circuit cited no case law to support this conclusion and instead appears simply to have assumed it to be true. Moreover, the question whether such a duty existed was not dispositive in *Ralston,* since the jury's finding that the primary insurer had satisfied its obligations to the insured was held to be supported by the evidence.[12] As a result, *Ralston* is not persuasive. This court is not convinced that Liberty had a duty to advise Anderson to notify American.[13]

## C. Liberty May Have Owed American a Direct Duty To Notify It of the *Voiro* action

American's assertions of Liberty's liability are better served by relying on the theory of a direct duty, as set forth in a recent New Jersey case. In *American Centennial Insurance Co. v. Warner-Lambert Co.,* 681 A.2d

---

See *Hutchison v. Luddy,* 763 A.2d 826, 837 n.8 (Pa. Super. 2000) (Pennsylvania courts are "not bound by decisions of federal courts construing state law").

12. American's attempt to make *Ralston* more persuasive by highlighting its citation in *United National Insurance Co.* is equally unavailing. In *United National Insurance Co., Ralston* was mentioned as an illustration of Missouri law and is not cited for the principle that American claims it stands for. As a result, the local use of *Ralston* does not mandate that the court accept American's argument.

13. Because this court finds that a primary insurer's duties to an insured do not include the obligations asserted by American, there is no need to address whether American qualifies as Anderson's subrogee.

1241 (N.J. Super. Law Div. 1995), the New Jersey Superior Court examined the liability of a primary insurer that failed to give notice to an excess carrier of a pending claim that ultimately implicated the excess policy. Like the Pennsylvania Commonwealth Court in *Physicians Insurance Co.*, the *American Centennial* court considered the "distinctive" and "unique relationship" in which "the excess insurer relies upon the primary carrier to act in good faith in processing claims." *Id.* at 1246. On this basis, the court found that this dependence had legal implications:

"Fairness and policy require the imposition of a duty of good faith on the primary carrier. The primary is in a knowledgeable position as it has current information of the status of an underlying claim, while the excess carrier relies on the primary carrier to keep it properly apprised of negotiation and litigation. It is a unique relationship between the parties, and it is reasonable for the excess carrier to rely on the primary carrier to act in good faith. The primary carrier should understand the risk involved to the excess carrier if it does not perform its duties in good faith. The excess carrier charges the insured a premium that assumes the primary carrier will act in good faith to settle and litigate claims, thereby decreasing the excess carrier's exposure to risk. When the primary carrier does not perform its duties in good faith, the public suffers, as excess carriers will then charge higher premiums for excess coverage. Therefore, the consideration of the unique relationship between the parties, the risk accruing to the excess carrier, and the public interest in lower premiums, mandates the imposition of a duty of good faith and fair dealing upon the primary

carrier." *Id.* at 1247.[14] See also, *General Accident Ins. Co. v. New York Marine and Gen. Ins. Co.,* 727 A.2d 1050, 1054 (N.J. Super. App. Div. 1999) (the duty of good faith running from a primary insurer to an excess

---

14. Similarly, courts in other jurisdictions have found duties running directly from a primary insurer to an excess insurer and allowed direct action based upon such duties. See *e.g., Attorneys Liab. Protection Soc'y v. Reliance Ins. Co.,* 117 F. Supp.2d 1114, 1124 (D. Kan. 2000) (primary insurer owes a duty of good faith to excess insurers); *National Union Fire Ins. of Pittsburgh, Pa. v. Liberty Mut. Ins. Co.,* 696 F. Supp. 1099, 1101 (E.D. La. 1988) (primary insurance carrier owes a duty of good faith to excess carrier); *Kaiser Found. Hosps. v. North Star Reinsurance Corp.,* 153 Cal. Rptr. 678, 682 (Cal. App. 1979) (primary insurer owes excess insurer duty of good faith and fair dealing); *Schal Bovis Inc. v. Casualty Ins. Co.,* 732 N.E.2d 1082, 1091 (Ill. App. 1999) (finding a direct duty of good faith running from a primary carrier to an excess carrier); *Commercial Union Ins. Co. v. Medical Protective Co.,* 356 N.W.2d 648, 651-52 (Mich. App. 1984), *aff'd in part,* 393 N.W.2d 479 (Mich. 1986) (a breach of good faith claim against a primary insurer "arises as a result of the independent and direct duty to the excess insurer and is not dependent upon equitable principles of subrogation"); *Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.,* 462 N.Y.S.2d 175, 178 (N.Y. App. Div. 1983), *aff'd,* 475 N.Y.S.2d 267 (N.Y. 1984) (allowing direct action by excess carrier against primary carrier based on breach of duty of good faith). See also, *Couch on Insurance 3d* §187:52 ("when a primary carrier/ excess carrier relationship is involved, proper notice means the primary carrier, not the insured, should advise the excess carrier of the existence of a claim"); *Id.* at §219:24 ("[t]he primary insurance company is required to provide the excess company notice of claims against the insured that might affect the excess policy. . ..").

But, see *Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Amer.,* 93 F. Supp.2d 982, 989 (S.D. Ind. 2000) (concluding that there is no duty running from a primary insurer to an excess insurer); *Blair v. Protective Nat'l Ins. Co.,* no. civ. a. 96-8438, 1997 WL 634423, at *1 (E.D. Pa. October 6, 1997) (stating that "[t]here is no duty running from a primary to an excess carrier under Pennsylvania law"). As an aside, because *Blair* is a federal court decision, it is not binding on this court

insurer "exists as a result of the distinctive and unique relationship between the two carriers"). Ultimately, the court concluded that this direct duty of good faith imposes on a primary insurer an obligation to notify an excess carrier, when known, if it reasonably appears that exposure may exceed the primary limit.[15]

Essentially, the parties' arguments here mirror those made by the parties in *American Centennial*. Liberty, on the one hand, asserts that it was Anderson's obligation to notify American and that Liberty had no such duty. Liberty's memorandum at 7. American's broad conten-

---

and, as discussed *infra* (pp. 491-92) in the review of *Puritan Insurance Co. v. Canadian Universal Insurance Co. Ltd,* 775 F.2d 76 (3d Cir. 1985), is not persuasive.

15. In reaching its conclusion, the *American Centennial* court analyzed and gave strong consideration to the guiding principles for primary and excess insurance companies, a set of guidelines promulgated by the insurance industry in 1974. The fifth principle addresses a primary carrier's obligation to give notice to an excess carrier:

"(5) If at any time, it should reasonably appear that the insured may be exposed beyond the primary limit, the primary insurer shall give prompt written notice to the excess insurer, when known, stating the results of investigation and negotiation, and giving any other information deemed relevant to a determination of the total exposure, and inviting the excess insurer to participate in a common effort to dispose of the claim." 681 A.2d at 1246.

It has been noted that, "[f]or the most part, the guiding principles relating to the primary insurer's conduct reflect the present state of the law in most jurisdictions." Michael M. Marick, *Excess Insurance: An Overview of General Principles and Current Issues,* 24 Tort & Ins. L.J. 715, 741 (1989). See also, *United States Fire Ins. Co. v. Nationwide Mut. Ins. Co.,* 735 F. Supp. 1320, 1324-25 (E.D. N.C. 1990) (finding that the principles "set forth the general standards of insurance practice").

tion that Liberty may have had a duty to notify it of the *Voiro* action, in contrast, is supported by the court's holding in *American Centennial,* although, admittedly, American does not cite that precedent. American's surreply memorandum at 4.[16]

This court concludes that *American Centennial* is persuasive. While Pennsylvania courts have not endorsed the concept of direct primary/excess insurer duties expressly, they have shown concern regarding the skewed relationship between the primary and the excess insurance carrier. See *e.g., Physicians Ins. Co.,* 167 Pa. Commw. at 500, 648 A.2d at 616 (noting that "[t]he insurance industry has long recognized the unsatisfactory nature of the relationship between primary and excess carriers"); *F.B. Washburn Candy Corp.,* 373 Pa. Super. at 485, 541 A.2d at 774 (noting the conflict of interest between a primary and an excess insurer). This imbalance is not rectified if the excess insurer is limited to claims based on equitable subrogation.[17]

---

16. While American does not assert that Liberty had a direct duty to notify it of potential liability, it makes the broad argument that, if Liberty believed that American was obliged to provide excess coverage, it had a duty to report the *Voiro* action to American. American's surreply memorandum at 4.

17. Essentially, the difference between a claim arising from equitable subrogation and one based on a primary carrier's direct duty to the excess carrier is that, "[u]nlike a direct duty running from the primary carrier to the excess carrier, a claim for equitable subrogation is subject to any defenses the primary carrier could assert against the insured, including refusal to settle and failure to cooperate." *Forum Ins. Co. v. Lorance & Thompson,* no. 14-97-00974-CV, 1999 WL 627878 (Tex. App. August 19, 1999). See also, Paul B. Butler Jr. & Robert V. Potter Jr., *The Primary Carrier Caught in the Middle with Bad Faith Exposure to its Insureds, Excess Carriers and Reinsurers,*

Moreover, the rationale supporting this theory is sound. Among the primary insurer, the excess insurer and the insured, only the primary insurer has both the information concerning the claim and the expertise necessary to evaluate that information and to determine if the excess policy is likely to be implicated.[18] As the *American Cen-*

---

24 Tort & Ins. L.J. 118, 123-24 (1988) ("[t]he primary concern to excess carriers with proceeding against the primary carrier on the basis of subrogation or assignment of claim is that by doing so, the primary carrier can assert against the excess carrier all defenses which the primary carrier has against the insured"). Courts and commentators alike have found the direct duty approach superior to the equitable subrogation approach for two reasons. First, it allows the excess insurer to recover "even though the insured engaged in culpable conduct that would destroy the excess carrier's bad faith claim under equitable subrogation." John F. Jenks, *Picking Up the Pieces: The Excess Insurer's Bad Faith Cause of Action Against the Primary Insurer,* 54 Mont. L. Rev. 385, 402 (1993). Second, it permits the court to "apportion liability between the primary insurer and the excess insurer based on principles of comparative negligence." *Id.* See also, *Estate of Penn v. Amalgamated Gen. Agencies,* 372 A.2d 1124, 1127 (N.J. Super. App. Div. 1977) (reviewing disadvantages of equitable subrogation); *Russo v. Rochford,* 472 N.Y.S.2d 954, 959 (N.Y. App. Div. 1984) (discussing advantages of the direct duty theory).

18. Many courts have recognized that the knowledge of a primary carrier is superior to that of both the insured and the excess insurer. See *e.g., Bohemia Inc. v. Home Ins. Co.,* 725 F.2d 506, 514 (9th Cir. 1984) ("[t]he insured is generally ignorant of insurance practices and legal procedure"); *Baen v. Farmers Mut. Fire Ins. Co. of Salem Cty.,* 723 A.2d 636, 639 (N.J. Super. App. Div. 1999) ("[t]he primary carrier is in a knowledgeable position, as it has current information of the status of an underlying claim, while the excess carrier relies on the primary carrier to act in good faith"); *United Servs. Auto Ass'n v. Empire Fire & Marine Ins. Co.,* 653 P.2d 712, 714 (Ariz. App. 1982) (primary insurer is "in a better position to evaluate its risk than would be a purely excess carrier against whom no claims might be made even though its insureds had repeatedly incurred liability in amounts within their primary coverage").

*tennial* court astutely noted, in the absence of a direct duty, the excess insurer's risk will increase, leading to a corresponding rise in excess insurance premiums. Cf. *Physicians Ins. Co.,* 167 Pa. Commw. at 500, 648 A.2d at 616 (noting that, "[b]ecause of its less frequent exposure, the excess carrier generally charges lower premiums"). Accordingly, Pennsylvania law supports and is best served by the principle that a primary insurer that is aware of an excess policy bears the responsibility for notifying the excess insurer that its policy may be implicated.

It must be acknowledged that the Third Circuit rejected the contention that there are any duties running directly from a primary carrier to an excess carrier in *Puritan Insurance Co. v. Canadian Universal Insurance Co. Ltd.,* 775 F.2d 76 (3d Cir. 1985). Nevertheless, the Third Circuit's decision is unconvincing on this issue for several reasons. First, *Puritan* is a federal court decision whose holding has never been adopted in Pennsylvania and is therefore not binding on this court. See *Kubik v. Route 252 Inc.,* 762 A.2d 1119, 1124 (Pa. Super. 2000) (decisions of federal courts are not binding on Pennsylvania courts). Second, to the extent that federal court decisions generally are persuasive, *Puritan* is not, in that the Third Circuit reached its conclusions without any discussion, reasoning or analysis.[19] In addition, *Puritan's*

---

19. The *Puritan* court stated that the theory of a direct duty was rejected in *United States Fire Insurance Co. v. Royal Insurance Co.,* 759 F.2d 306 (3d Cir. 1985) and relied exclusively on that case. As pointed out in the dissent in *Puritan,* however, the *United States Fire* court relied on the theory of equitable subrogation and left open the question of a direct duty:

legitimacy is not beyond question. In a recent Eastern District case, Judge John P. Fullam Sr. stated that it is "conceivable" that a primary insurer "might be found to have breached a duty owed directly to the excess carrier." *Blair v. Protective Nat'l Ins. Co.,* no. 96-8438, 1998 WL 212768, at *1 (E.D. Pa. 1998). Last, and perhaps most significant, *Puritan* was decided before the emergence of the "modern trend for courts and legislatures to impose duties of good faith and fair dealing on the relationship between primary and excess carriers." *Couch* section 198:20. For these reasons, this court declines to follow *Puritan* and holds that a primary carrier that is aware of an insured's excess policy owes a direct duty to the excess insurer to notify it of claims that may implicate the excess policy.

In the instant matter, the approach adopted in *American Centennial* imposes a direct duty on Liberty owed to American. Thus, Liberty had an obligation to notify American of the *Voiro* action, if it was aware of the excess insurance policy and should reasonably have known that exposure in the *Voiro* action might exceed the $2 million limit under the Liberty policy.

---

"[Excess insurer] Fire strongly urges that this court allow a direct cause of action by the excess carrier against the primary 'thus obviating the need to struggle with the equitable subrogation theory.' Supp. brief of appellee at 10. Fire has cited no Pennsylvania cases creating such a direct duty and no plausible legal or policy basis for so doing. We decline to do so in the instant case, without further guidance from the Pennsylvania Supreme Court." 759 F.2d at 309 n.3.

In addition, the question of a direct duty was moot in *United States Fire,* as the court held that the primary insurer had not acted in bad faith. 759 F.2d at 311-12.

## D. In the Alternative, Liberty May Have Had a Duty As Anderson's Subrogee To Notify American of the *Voiro* Action Under the Notification Requirements in the American Policy

The direct duty theory is not the only rationale that supports American's claims.

Several cases embrace the principle that a primary insurer is, in effect, subrogated to the insured's claims and thus assumes the insured's obligation to notify the excess carrier according to the terms of the excess policy.[20] This "primary insurer subrogation" theory is best illustrated in *Sequoia Insurance Co. v. Royal Insurance Co. of America,* 971 F.2d 1385 (9th Cir. 1992), where the court relied primarily on the notification terms of the excess insurance contract itself to find that the primary insurer had a duty to notify the excess carrier. See also, *North Amer. Van Lines Inc. v. Lexington Ins. Co.,* 678 So.2d 1325, 1331 (Fla. Dist. App. 1996) ("the primary insured's position is analogous to that of the insured"); John K. DiMugno & Paul E.B. Glad, *California Ins. L. Handbook* §32.06(1) (2000) ("[a]s its insured's subrogee, a primary insurer is obligated to comply with the notice and cooperation provisions in the insured's excess policy"). Because nearly all insurance policies have a notification provision, the primary insurer subrogation

---

20. It is important to distinguish this theory, under which a *primary* insurer becomes the insured's subrogee, from the theory put forward by American under which an *excess* insurer becomes the insured's subrogee.

approach almost always will lead to the same result as imposing a direct duty.[21]

This principle has not been universally adopted. Assigning an insured's responsibilities to a primary insurer through subrogation was considered and rejected by the New York court in *Monarch Cortland v. Columbia Casualty Co.,* 646 N.Y.S.2d 904 (N.Y. App. Div. 1996).[22] The court there held that the defendant primary insurer did not assume the notice duties of the plaintiff insured:

"There is no evidence in the record that defendant acted deliberately or even recklessly. Nor is there anything in the record to suggest that defendant put its own interests ahead of plaintiff's interests; defendant had nothing to gain by not informing plaintiff of possible excess liability. The record also demonstrates that defendant kept plaintiff informed of all the relevant facts, so that plaintiff had essentially the same information as defendant on which to form an opinion as to the need to notify the

21. It is unclear if a primary insurer's notice and ongoing information obligations must be interpreted as strictly as they would be for an insured. Compare *Bohemia Inc.,* 725 F.2d at 513-14 (a primary insurer's duties were satisfied when it notified the excess insurer of the claim even if it did not keep it apprised of significant developments in the case), with Butler & Potter, 24 Tort & Ins. L.J. at 128-29 (a primary insurer has ongoing responsibilities to the excess insurer, including the duty to notify the excess insurer of settlement offers and significant developments).

22. As an aside, the trial court in *Monarch Cortland* had been guided by the principles, even though the primary insurer had not signed them. In reversing the trial court on the question of bad faith, however, the appellate division eschewed discussion of the principles, focusing instead on the terms of the excess insurance policy and the insured's obligations thereunder.

excess carrier. As the insured, plaintiff clearly had the obligation to notify the excess carrier 'as soon as practicable' pursuant to the terms of the excess policy. Having had essentially the same information as defendant, *plaintiff should not be permitted to shift to defendant the responsibility for failing to notify the excess carrier, an obligation imposed on plaintiff alone by its contract with the excess carrier.* At most, plaintiff's evidence established defendant's erroneous belief that plaintiff's liability would not exceed the primary policy limits. Such an error in judgment cannot serve as the predicate for a bad-faith action. . . ." *Id.* at 906. (emphasis added)[23]

The *Monarch Cortland* rationale is ultimately unpersuasive, however, primarily because it ignores the fact that an insured seldom has the expertise necessary to evaluate a claim and to determine whether informing an excess insurer is warranted. The party in the best position to evaluate a claim and to notify an excess insurer is the primary insurance carrier, not the insured. In addition, New York allows an excess insurer to proceed against a primary insurer under a direct duty theory. *Hartford Accident & Indemn. Co. v. Michigan Mut. Ins. Co.,* 462 N.Y.S.2d 175, 178 (N.Y. App. Div. 1983), *aff'd,*

---

23. In *AAA Sprinkler Corp. v. General Star National Insurance Corp.,* 705 N.Y.S.2d 582 (N.Y. App. Div. 2000), the court cited *Monarch Cortland* in support of the statement that a primary insurer "had not acted in bad faith when it failed to notify its insured or the insured's excess liability carrier of the possibility of a judgment in excess of the primary policy limits." Because the *AAA Sprinkler* court did not set forth the facts of that case, however, it is unclear whether this means that a primary insurer's failure to give notice of the possibility of an excess judgment should never constitute bad faith in New York.

475 N.Y.S.2d 267 (N.Y. 1984). As such, imposing an insured's contractual duties on a primary insurer would be redundant and, in fact, could serve to limit the rights accruing through the primary insurer's direct duty to the excess insurer. Consequently, for the same reasons, legal and otherwise, that the direct duty theory is appropriate, primary insurer subrogation liability is also justified.

Here, under the primary insurer subrogation theory, Liberty was subrogated to Anderson's position as the insured and assumed Anderson's notification obligations as set forth in the American policy. Thus, under both the direct duty and primary insurer subrogation approaches, Liberty potentially had a duty to notify American of the *Voiro* action.

## II. *There Are Outstanding Issues of Material Fact As To Whether Liberty Should Have Notified American and Whether Liberty Satisfied Its Notification Obligations*

While no Pennsylvania case addresses when the duty to give notice to an excess insurer arises, *Couch on Insurance 3d* sets forth the following rule:

"[P]olicy language requiring an insured to notify an excess insurer of potential liability under the policy imposes a duty on the insured to give notice when the insured becomes aware, or should become aware of facts to suggest to a reasonably prudent person that an occurrence or action might reasonably be expected to produce a claim against the insurer." Section 191:67.[24]

---

24. See also, *CSX Transp. Inc. v. Commercial Union Ins. Co.*, 82 F.3d 478, 481 (D.C. Cir. 1996) ("the notice obligation arises when,

Once the duty to notify an excess insurer has been triggered, Pennsylvania law holds that an insured's failure to comply with the notice requirements in an insurance contract relieves an insurance carrier of liability only if the carrier can demonstrate that it was prejudiced by late notice. *Nationwide Mutual Insurance Co. v. Lehman,* 743 A.2d 933, 940 (Pa. Super. 1999). This is based on the underlying reasons for the notice provision:

"The function of the notice requirements is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice nor to evade the fundamental protective purpose of the insurance contract to assure the insured and the general public that liability claims will be paid up to the policy limits for which premiums were collected. Therefore, unless the insurer is actually prejudiced by the insured's failure to give notice immediately, the insurer cannot defeat its liability

---

viewed objectively, the facts and circumstances known to the insured would have suggested to a reasonable person the possibility of a claim likely to trigger the excess insurer's coverage"); *Olin Corp. v. Insurance Co. of N. Amer.,* 743 F. Supp. 1044, 1054 (S.D. N.Y. 1990) (the "duty to notify each excess insurer accrued when the circumstances known to [insured] would have suggested a reasonable possibility of a claim that would trigger that excess insurer's coverage"); *Household Int'l Inc. v. Liberty Mut. Ins. Co.,* no. 1-99-2094, 1-99-3044, 2001 WL 209813, at *7 (Ill. App. March 2, 2001) ("the two important considerations for review include (1) the reasonable possibility of a claim; and (2) the reasonable likelihood that the claim would implicate the excess policy layers"); Barry R. Ostrager & Thomas R. Newman, *Handbook on Ins. Coverage Disputes, 9th ed.* §4.02 (1998) ("an insured's duty to provide notice to its excess insurers typically arises when the insured has reason to believe that an occurrence is likely to involve the excess coverage," as "judged by an objective standard").

under the policy because of the non-prejudicial failure of its insured to give immediate notice of an accident or claim as stipulated by a policy provision." *Brakeman v. Potomac Insurance Co.,* 472 Pa. 66, 75, 371 A.2d 193, 197 (1977). (citation omitted)

American asserts that Liberty was aware of the American policy by August 1997, at the latest, and that the attorney working on the *Voiro* action advised Liberty on February 19, 1998 that American should be notified. American's memorandum at 14. The joinder complaint asserts that Liberty was aware that the *Voiro* action had a value in excess of $2 million some time before March 2, 1998. Joinder complaint at ¶¶12-13, 16-17. American allegedly did not receive notice of the *Voiro* action until September 4, 1998, precluding it from participating in the defense of the matter and settlement conferences. American's memorandum at 5, 7-8; joinder complaint at ¶¶18-21. If American's allegations are correct, they establish that Liberty had a duty to give notice to American, that Liberty breached its duty and that prejudice to American resulted.

As might be expected, Liberty contests the truth of each of these points. See Liberty's answer to joinder complaint. As a result, there are outstanding disputed issues of material fact, and the court could not grant summary judgment in any event. Cf. *Rohm and Haas Co. v. Continental Casualty Co.,* 732 A.2d 1236, 1259 (Pa. Super. 1999) (24-year delay in giving notice to excess insurer created question of fact for jury).

## III. *American's Joinder Complaint Is Proper Under Rule 2252*[25]

Rule 2252 sets forth the conditions under which a defendant may join an additional party:

"(a) Except as provided by Rule 1706.1,[26] any defendant or additional defendant may join as an additional defendant any person, whether or not a party to the action, who may be

"(1) solely liable on the plaintiff's cause of action, or

"(2) liable over to the joining party on the plaintiff's cause of action, or

"(3) jointly or severally liable with the joining party on the plaintiff's cause of action, or

"(4) liable to the joining party on any cause of action arising out of the transaction or occurrence or series of transactions or occurrences upon which the plaintiff's cause of action is based."

In determining if joinder is permitted, Rule 2252 "is broadly construed to effectuate the purpose of avoiding multiple lawsuits by settling, in one action, all claims arising from transactions or occurrences which gave rise to the plaintiff's complaint." *Goodman v. Kotzen,* 436 Pa. Super. 71, 78, 647 A.2d 247, 250 (1994) (citing *Olson v. Grutza,* 428 Pa. Super. 378, 389, 631 A.2d 191, 196-97 (1993)).

---

25. An evaluation of this final issue is complicated by the fact that American all but ignores it in the documentation it has submitted to the court.

26. Rule 1706.1 addresses joinder in a class action lawsuit.

500

Here, there is no doubt that American's claims arise from the same transactions and occurrences as U.S. Fire's claims. The joinder complaint incorporates all of the allegations in U.S. Fire's complaint. Joinder complaint at ¶4. In addition, the sole count brought against Liberty makes it clear that Liberty's liability is dependent on the facts asserted by U.S. Fire. *Id.* at ¶23. Most important, the essence of U.S. Fire's cause of action is the allocation of responsibility for the *Voiro* action settlement in excess of the Liberty policy, a question that the joinder complaint addresses. As such, allowing the joinder complaint will effectuate Rule 2252's purpose of preventing multiple lawsuits and is the appropriate course of action.

Liberty counters by pointing to *Gould Inc. v. Continental Casualty Co.,* 401 Pa. Super. 219, 585 A.2d 16 (1991), and *American Metal Fabricators Co. v. Goldman,* 227 Pa. Super. 284, 323 A.2d 891 (1974), each of which, it contends, limits the definition of "transactions and occurrences" and mandates dismissal of the joinder complaint. But, in each of those cases the court focused on the lack of a valid claim and dismissed the joinder complaints for that reason. See *Gould Inc.,* 401 Pa. Super. at 224-25, 323 A.2d at 19 (agreeing that joinder was improper because the third-party defendant was not contributorily liable to the third-party plaintiff); *American Metal Fabricators Co.,* 227 Pa. Super. at 289, 323 A.2d at 894 (finding that no valid cause of action was asserted against the additional defendants). As discussed at length *supra,* American's cause of action against Liberty is valid. Thus, Liberty's argument based on Rule 2252 is unconvincing, and the joinder complaint is proper.[27]

---

27. Because the joinder complaint is proper under Rule 2252(a)(4), there is no need to address Liberty's argument that it is not authorized under Rule 2252(a)(1), (2) and (3).

## CONCLUSION

For these reasons, this court finds that the joinder complaint is proper under Rule 2252. Further, the court finds that Liberty may have been required to give American notice of the *Voiro* action either under a direct duty theory or as Anderson's subrogee. However, because disputed issues of material fact remain outstanding the motion for summary judgment should be denied. This court will enter a contemporaneous order consistent with this opinion.

## ORDER

And now, April 6, 2001, upon consideration of the motion for summary judgment of third-party defendant Liberty Mutual Fire Insurance Company, the opposition to it of third-party plaintiff, American National Fire Insurance Company, the respective memoranda, all other matters of record, and in accord with the opinion being filed contemporaneously with this order, it is hereby ordered that the motion for summary judgment is denied.